UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| F. SCOTT BAUER<br>969 Bryansplace Rd.<br>Winston-Salem, NC 27104<br><br>and<br><br>JEFFREY T. CLARK,<br>555 Knob View Dr.<br>Winston Salem, NC 27104<br><br>               Plaintiffs,<br><br>    v.<br><br>FEDERAL DEPOSIT INSURANCE<br>CORPORATION<br>c/o  Mr Robert E. Feldman<br>Executive Secretary<br>550 17th Street, NW<br>Washington, DC  20429 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 1:18-cv-3047 |

SOUTHERN COMMUNITY FINANCIAL
CORPORATION,
c/o Secretary of State, Registered Agent
P.O. Box 29622
Raleigh, North Carolina 27626

SOUTHERN COMMUNITY FINANCIAL,
LLC,
c/o Corporation Service Company, Registered
Agent
251 Little Falls Drive
Wilmington, Delaware 19808

SOUTHERN COMMUNITY BANK AND
TRUST,
c/o James Hastings, Registered Agent
4605 Country Club Road

Winston-Salem, North Carolina 27104

WINSTON 23 CORPORATION,
c/o Corporation Service Company, Registered
Agent
327 Hillsborough Street
Raleigh, North Carolina 27603

CAPITAL BANK CORPORATION,
c/o Secretary of State, Registered Agent
P.O. Box 29622
Raleigh, North Carolina 27626

CAPITAL BANK FINANCIAL
CORPORATION,
c/o Corporation Service Company, Registered
Agent
251 Little Falls Drive
Wilmington, Delaware 19808

CAPITAL BANK, N.A.,
c/o Registered Agent
1776 E. Jefferson Street
Rockville, Maryland 20852

FIRST HORIZON NATIONAL
CORPORATION,
c/o Clyde A. Billings, Jr., Registered Agent
165 Madison Avenue
Office of the Corporate Secretary
Memphis, TN 38103-2723

and FIRST TENNESSEE BANK NATIONAL
ASSOCIATION,
CT Corporation System
160 Mine Lake Ct Suite 200
Raleigh, NC 27615

Defendants.

## COMPLAINT

Plaintiffs F. Scott Bauer ("Bauer") and Jeffrey T. Clark ("Clark") file their complaint against Defendants Federal Deposit Insurance Corporation ("FDIC"), Southern Community Financial Corporation ("SCFC"), Southern Community Financial, LLC ("LLC"), Southern Community Bank and Trust ("Bank"), Winston 23 Corporation ("Merger Sub"), Capital Bank Corporation ("Capital"), Capital Bank Financial Corporation ("Capital Holding"), Capital Bank, N.A. ("Capital N.A."), First Horizon National Corporation ("First Horizon"), and First Tennessee Bank National Association ("First Tennessee") (the non-FDIC Defendants, collectively, the "Bank Defendants").[1]  Plaintiffs seek declaratory and injunctive relief to hold unlawful and to set aside the FDIC's final agency determination dated June 13, 2017 on the grounds that the FDIC's action exceeded the FDIC's statutory authority; was arbitrary, capricious, or an abuse of discretion, or was otherwise not in accordance with law as set forth herein; was inconsistent with and outside the scope of the FDIC's own governing regulations; was undertaken without observance of the procedures required by law; and deprived Plaintiffs of property interests without due process of law.

## INTRODUCTION AND SUMMARY OF THE ACTION

This action challenges an FDIC final agency determination that destroyed Plaintiffs' contractual and property rights. Plaintiffs are two former North Carolina

---

[1]   For ease of reference, when possible, the short forms for the parties used in this Complaint are the short forms for the parties used by the FDIC in the final agency determination at issue in this action.

bank executives; each had employment contracts protecting him in the event the bank was acquired by merger; each contract was approved by the bank's board of directors; and each contract imposed a duty on the bank to ensure that if the bank were acquired by merger, the successor institution would have to "assume and perform" Plaintiffs' contracts. By the terms of those contracts, any change-in-control payments to Plaintiffs upon or after the merger would necessarily be paid by the successor institution, after the successor had assumed and commenced performance of the employment contracts. Here, the successor institution did not want to assume and perform the contracts as written. When the Plaintiffs refused to accept the amendments demanded by the successor prior to the merger, the successor convinced Plaintiffs' employer to breach the agreements and fire Plaintiffs before closing. Predictably, Plaintiffs sued. While that state court action was pending, and nearly five years after the events at issue, the successor sought the aid of the FDIC. The FDIC determined that Plaintiffs are barred from enforcing their contractual rights, holding that any judgment or settlement in the state court action could not be paid by the successor.

The FDIC relied squarely on a statute and a regulation that restrict certain payments to executives by a "troubled" financial institution. Such payments by a troubled institution are called "golden parachute payments." The statute and regulation further limit the definition of "golden parachute payment" to a payment "in the nature of compensation" that is "contingent on, or by its terms is payable on or after, the termination of such party's primary employment or affiliation with the

institution." But the problem is, Plaintiffs' contracts provide, naturally, for change-in-control benefits to be paid by the successor institution (upon and after the merger); and the successor institution here is concededly *not* a "troubled" financial institution. And the payments at issue were not contingent on, or by their terms payable on or after, the termination of Plaintiffs' employment; on the contrary, Plaintiffs' agreements required that the agreements be assumed and performed by any successor, not terminated. Finally, the FDIC even determined that the Plaintiffs could not enforce their unconditional contractual right to reimbursement of out-of-pocket attorney fees incurred in challenging a breach of their agreements, even though such a payment was neither "in the nature of compensation" nor "contingent on" Plaintiffs' terminations.

The FDIC thus engaged in sleight of hand: it took a statutory/regulatory restriction on "golden parachute" payments by *troubled* financial institutions and said it should also apply to payments by a healthy, *non*-troubled financial institution that acquires a troubled institution. And it used the fact that Plaintiffs were *actually* terminated (wrongfully) as a stand-in for the requirement that the contractual term *itself* provide that the payment be due after termination. And to cap it off, the FDIC erroneously treated a contractual right to attorney-fees reimbursement as a "golden parachute" payment in the nature of compensation. This rewriting of the statute (and regulation) was arbitrary and capricious and a violation of law. Congress has defined what a restricted "golden parachute" payment is, and the FDIC has no authority to rewrite Congress's definition—or to

ignore its own regulatory definition. For the reasons set forth in detail below, the FDIC's determination should be set aside.

## PARTIES AND JURISDICTION

1.     Plaintiff F. Scott Bauer is a resident of Forsyth County, North Carolina.

2.     Plaintiff Jeffrey T. Clark is a resident of Forsyth County, North Carolina.

3.     Jurisdiction and venue are proper in this Court. This Court has subject-matter jurisdiction and the authority to grant the requested relief under the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA"), the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and 28 U.S.C. § 1331.

4.     Defendant FDIC is, and was at all relevant times, a banking agency of the United States government subject to the APA. The FDIC is an "agency" as defined in the APA. *See* 5 U.S.C. § 701(b)(1). The FDIC is located at 550 17th Street NW, Washington, D.C. 20429.

5.     Defendant Bank was a North Carolina-chartered bank with its principal place of business in North Carolina. It was a wholly-owned subsidiary of Defendant SCFC, a corporation formed under the laws of North Carolina with its principal place of business in North Carolina. (Together, Bank and SCFC are referred to as "Southern Community.")

6.     In 2012, Southern Community was purchased through certain transactions constituting a "reverse triangular merger," as follows:

6

a. Defendant Merger Sub was a corporation formed under the laws of North Carolina with its principal place of business in North Carolina. On October 1, 2012, Defendant Merger Sub merged into Defendant SCFC. On October 11, 2012, Defendant SCFC merged into Defendant LLC, a limited-liability company formed under the laws of Delaware with its principal place of business in Florida.

b. On December 11, 2012, Defendant Bank merged into Defendant Capital N.A., a federally-chartered bank with its principal place of business in Florida.

c. Defendant Capital N.A. was a wholly-owned subsidiary of Defendant Capital, a corporation formed under the laws of North Carolina with its principal place of business in Florida. On September 24, 2012, Defendant Capital merged into Defendant Capital Holding, a corporation formed under the laws of Delaware with its principal place of business in Florida. (Together, Defendant Merger Sub, Defendant LLC, Defendant Capital N.A., Defendant Capital, and Defendant Capital Holding are referred to as "Capital Bank.")

7. Effective November 30, 2017, Capital Holding merged into First Horizon National Corporation ("First Horizon"), and Capital merged into First Tennessee Bank National Association ("First Tennessee").

8.     Defendant LLC is liable for the debts and obligations of Merger Sub and SCFC.

9.     Defendant Capital N.A. is liable for the debts and obligations of Southern Community Bank and Trust.

10.    Defendant Capital Holding is liable for the debts and obligations of Defendant Capital Bank Corporation.

11.    Upon information and belief, Defendant Capital Holding and/or Capital N.A. ultimately own, in whole or in part, Southern Community Financial, LLC.

12.    First Horizon is liable for the debts and obligations of Capital Holding and/or Capital N.A.  First Tennessee is liable for the debts and obligations of Capital and/or Capital N.A.

13.    This Court has personal jurisdiction over each of the Defendants.

14.    Plaintiffs have satisfied all conditions precedent to bringing this action.

## UNDERLYING FACTS[2]

### Plaintiffs Founded and Grew Southern Community

15.    All preceding paragraphs are incorporated by reference.

---

[2]     These facts are taking from the Amended Complaint in *Bauer and Clark v. Southern Community Financial Corp. et al.,* 14 CVS 7208 (Forsyth County, NC) (referenced herein as the "State Lawsuit."). The Amended Complaint in the State Lawsuit was considered by the FDIC in reaching the determinations challenged in this action and is part of the administrative record.  The agreements referenced in this Complaint are attached as exhibits to the Amended Complaint in the State Lawsuit.

16. Bauer founded Southern Community in Winston-Salem in 1995, serving as its CEO and President.

17. Clark joined Southern Community in its first year, as Senior Vice President and Chief Commercial Banking Officer.

18. Over the years, Plaintiffs grew Southern Community from assets of around $12 million to assets of around $1.7 billion. Plaintiffs helped Southern Community become one of the most valuable community banks in the area.

**Plaintiffs and Southern Community Negotiated and Signed Employment Agreements**

19. Over the years, Plaintiffs had various employment agreements and benefit plans with Southern Community.

20. On April 28, 2006, Bauer and Southern Community signed a written employment agreement ("Bauer's Employment Agreement"). Bauer's Employment Agreement was amended twice.

21. On March 16, 2007, Bauer and Southern Community signed a written salary continuation agreement providing for retirement benefits for Bauer ("Bauer's Salary Continuation Agreement"). Bauer's Salary Continuation Agreement was amended twice.

22. On April 28, 2006, Clark and Southern Community signed a written employment agreement ("Clark's Employment Agreement") (together, with Bauer's Employment Agreement, "the Employment Agreements"). Clark's Employment Agreement was amended twice.

23.   On March 14, 2007, Clark and Southern Community signed a written salary continuation agreement providing for retirement benefits for Clark ("Clark's Salary Continuation Agreement") (together, with Bauer's Salary Continuation Agreement, "the Salary Continuation Agreements").   Clark's Salary Continuation Agreement was amended twice.   Together, the Employment Agreements and the Salary Continuation Agreements are referred to as "the Agreements."

24.   The Employment Agreements contained various provisions regarding term of employment, salary, benefits, etc.   In addition, Article 5 of the Employment Agreements provided certain benefits in the event of a "Change in Control," which was defined to include, among other things, a merger or acquisition of Southern Community.

25.   Article 8.1 of the Employment Agreements provided: (1) that the Employment Agreements are binding on Southern Community's successors; and (2) that Southern Community "shall require any successor...to expressly assume and agree to perform [the agreements] in the same manner and to the same extent the [Bank] would be required to perform if no such succession had occurred."

26.   Article 8.9 of the Employment Agreements provided:  "The Employer is aware that after a Change in Control management could cause or attempt to cause the Employer to refuse to comply with its obligations under this Employment Agreement, or could institute or cause or attempt to cause the Employer to institute litigation seeking to have this Employment Agreement declared unenforceable, or could take or attempt to take other action to deny Executive the benefits intended

10

under this Employment Agreement." "Accordingly," Article 8.9 continued, Southern Community agreed that the "fees and expenses of counsel" retained to enforce Plaintiffs' rights under the Employment Agreements would be "paid or reimbursed to the Executive by the Employer" up to $500,000.

27.    Articles 2 and 7 of the Salary Continuation Agreements contained the same terms as Articles 5 and 8 of the Employment Agreements, such that those agreements grant Plaintiffs the same rights as are granted in the Employment Agreements. *See* §§ 2.4, 2.5, 7.2, 7.5.

28.    Plaintiffs were not alone in being granted change-in-control rights to protect them in the event of a merger or acquisition. Approximately 80 employees—including tellers—were granted such rights.

29.    The "Change in Control" benefits helped Southern Community to fulfill its mission as a longstanding community bank by ensuring longtime, loyal employees. The benefits were not reserved only for senior executives, but for employees of all levels, because community banking is a dynamic industry with sometimes high turnover, and the benefits were key to Southern Community's success.

### The Merger with Capital Bank

30.    Beginning in 2009, Southern Community began experiencing financial difficulties as a result of the financial crisis that negatively impacted financial institutions throughout the United States.

31.     In 2011, the Bank agreed to entry of a Consent Order with the FDIC. As a result of the Consent Order, the Bank was deemed to be in troubled condition pursuant to 12 CFR § 303.101(c).   Also in 2011, SCFC entered into a written agreement with the Federal Reserve Bank of Richmond, which required SCFC to comply with the restrictions on indemnification and severance payments in Part 359 and 12 U.S.C. § 1828(k).

32.     Plaintiffs successfully guided Southern Community through the financial crisis, always ensuring that it was well capitalized.   Indeed, during the last five quarters of Plaintiffs' employment, they had returned Southern Community to profitability.

33.     By 2012, Plaintiffs' efforts in ensuring the continued and future success of Southern Community had made it an attractive target for acquisition at a substantial price for shareholders.

34.     In early 2012, Capital Bank approached Southern Community about possibly purchasing Southern Community.

35.     On March 16, 2012, Southern Community and Capital Bank signed a binding merger agreement outlining the terms on which Capital Bank would acquire Southern Community.   In a joint SEC filing by Southern Community and Capital Bank on March 27, 2012, the institutions reported that they had "signed a definitive merger agreement."   That agreement was amended effective June 25, 2012.   The agreement as amended is referred to as "the Merger Agreement."   The Merger Agreement expressly provided that it could not be terminated except on

mutual consent or uncured breach; there was no unilateral right to terminate by either side.

36.    The Merger Agreement provided that Capital Bank could ultimately pay almost 1.5 times book value for Southern Community, a price that reflected Plaintiffs' successful efforts in leading Southern Community.

37.    Section 7.2(g) of the Merger Agreement required Southern Community to ensure that Plaintiffs, along with more than 80 other non-executive employees, execute amendments to their employment agreements that materially reduced the value of those employment agreements to the employees, including by removing and/or reducing "Change in Control" benefits.  The affected employees, including Plaintiffs, and the required waivers of rights and amendments, were set forth in a schedule to the Merger Agreement.

38.    Nothing in the Merger Agreement required Capital Bank to expressly assume and agree to perform the Agreements in the same manner and to the same extent the Bank would be required to perform, as required by the express provisions of the Agreements.

39.    By executing the legally enforceable, definitive Merger Agreement, the Southern Community Board, which had originally approved and granted the Agreements, breached those Agreements by, among other things, failing to require Capital Bank to expressly assume and agree to perform the agreements in the same manner and to the same extent Southern Community would be required to perform,

and instead choosing *not to require* Capital Bank to expressly assume and agree to perform them.

40.     After the Merger Agreement was signed, Southern Community demanded that Plaintiffs sign the proposed amendments to their Employment Agreements and Salary Continuation Agreements.   According to Southern Community, Capital Bank would not complete its acquisition of Southern Community unless the amendments were signed.   In fact, Southern Community attorney Ron Raxter expressly stated that the amendments were a precondition to closing, and a precondition that Capital would not waive.

41.     The proposed amendments were entirely for the benefit of Southern Community and certain directors (and more importantly, its suitor, Capital Bank), and entirely to the detriment of Plaintiffs and the other employees.   Plaintiffs were not provided the opportunity to negotiate any aspect of the proposed amendments. Among other things, the proposed amendments—dictated by Capital Bank and its counsel—would have: (1) changed Plaintiffs' job titles; (2) replaced the Change in Control benefits with a much smaller lump sum payment; (3) removed the provisions that the agreements would be binding on Southern Community's successors and that Southern Community was obligated to get a written assumption of such by any successor; (4) removed the provisions that Southern Community would have to pay Plaintiffs' legal fees in connection with enforcement of their rights under the Agreements; and (5) made the covenant not to compete

more stringent, effectively rendering Plaintiffs unemployable in their current profession at any entity that would be a potential competitor to Capital Bank.

42.    While the proposed amendments did greatly reduce the amount of Change in Control payments due to Plaintiffs, they did still (a) provide for Change in Control payments; and (b) provide that such payments would be made within 45 days after the closing.   In other words, the proposed amendments acknowledged that nothing would prohibit Southern Community's successor-in-interest after the merger closed from making those payments, in any amount, and that the proposed merger between Southern Community and Capital Bank (and not some hypothetical future merger) triggered the obligation to make "Change in Control" payments under Section 5.1.   (This acknowledgment by the Bank Defendants is contrary to the FDIC determination that they now rely on, as explained later.)

43.    The amendments themselves were drafted by Capital Bank, through its attorneys at the Wachtell Lipton law firm.   Capital Bank, through Wachtell Lipton, dictated on behalf of Southern Community all negotiations over the amendments.    Furthermore, Capital Bank executives Gene Taylor and Chris Marshall met with Southern Community Human Resources personnel and instructed them on how to market the amendments to relevant Southern Community employees.   Through this conduct, Capital Bank, with the assistance of its counsel, was exercising a "Controlling Influence" over Southern Community through its control of Southern Community's board of directors, in violation of federal banking laws that require a party to obtain prior regulatory approval for a

15

change of control before exercising such influence over an insured depository institution.

44.     On May 17, 2012, for example, Raxter sent the draft amendments to Plaintiff Clark via email.  The electronic drafts, in Microsoft Word format, had "WLR&K DRAFT" watermarks on them, indicating that the drafts were created by Wachtell.  The draft amendments for Plaintiff Bauer had the same Wachtell watermark on them.

45.     On July 24, 2012, Raxter called Todd Eveson, an attorney for Plaintiffs, and told Eveson that any and all proposed revisions to the amendments would have to be approved by Wachtell—and in the words of Raxter, "even moving a comma" would require Wachtell's approval.

46.     The amendments themselves, after they were drafted and dictated by Wachtell/Capital Bank, were given to Raxter to circulate to Southern Community's employees and demand signatures.  Raxter was the same Southern Community lawyer who had reviewed and approved the existing employment agreements, including their Change in Control provisions, in the first place.

47.     Southern Community, through its Board of Directors, made absolutely no effort to ensure that Capital Bank assumed and agreed to perform the obligations of the Agreements, as the Agreements required.

48.     Under the Agreements with Bauer and Clark, Southern Community could have either:  (1) negotiated with Capital Bank to ensure that the Merger Agreement required Capital Bank to assume and agree to perform the obligations of

the Agreements, or otherwise to ensure that the Merger Agreement required Capital Bank to pay the amounts due to Plaintiffs under the Agreements; or (2) negotiated with Plaintiffs prior to executing the Merger Agreement for Plaintiffs to modify their rights under the Agreements in a way satisfactory to both Plaintiffs and Capital Bank.  Instead, Southern Community colluded with Capital Bank and submitted to Capital Bank's control and executed a binding Merger Agreement that ensured that Capital Bank would *not* assume or agree to perform the Agreements, and it issued an ultimatum to Plaintiffs that they knuckle under and sign the amendments or Southern Community would terminate them.

49.     There is no reason, legal or otherwise, why Capital Bank could not have assumed and agreed to perform the obligations of the Agreements.

50.     During the negotiations between Southern Community and Capital Bank but before the closing of the actual merger, Capital Bank was exercising a "controlling influence" over Southern Community, in violation of federal banking law (which defines "controlling influence" broadly) and with a purpose of ensuring that Southern Community's obligations in the Agreements would not be honored by Southern Community or assumed by Capital Bank.  Among other things: (a) Capital Bank drafted the Merger Agreement; (b) Capital Bank drafted the definitive proxy statement filed only by and on behalf of Southern Community; (c) a day or two after the Merger Agreement was signed, Capital Bank's Gene Taylor and Chris Marshall were in Southern Community's operations centers, where they interfered with and directed operations and offered certain Bank employees future employment; (d)

upon information and belief, Marshall and Southern Community Board Chairman William G. Ward together discussed and agreed on an ultimatum read to Southern Community's executives at a board meeting that they sign the amendments or be terminated; and (e) as described above, counsel for Capital Bank actually drafted the proposed amendments to the Agreements and dictated on behalf of Southern Community all negotiations over the Agreements, up through and including the decision to terminate Plaintiffs' employment when they insisted that Southern Community and Capital Bank honor the Agreements.

51.    While Southern Community never demanded of Capital Bank that it assume the Agreements and the similar agreements of more than 80 other employees, it did make some demands on Capital Bank.  For example, Southern Community demanded that the deal be changed from a 40% cash/60% stock deal worth about $48 million to a 100% cash deal worth about $52 million, a change that greatly benefitted Ward and the other directors.

**Defendants Asserted Bogus Reasons
to Avoid Honoring the Employment Agreements**

52.    While the merger was pending, Southern Community began to contend that its participation in the Troubled Asset Relief Program ("TARP"), and the related Emergency Economic Stabilization Act of 2008 ("EESA"), prohibited it from providing the termination benefits called for in the Agreements, including the benefit of ensuring that Capital Bank assume and agree to perform the obligation to provide the payments or similar compensation called for in the Agreements.

53.    However, there is no TARP/EESA or other legal restriction on requiring an acquiring bank to assume obligations in an employment agreement.

54.    Moreover, pursuant to the Department of the Treasury's Interim Final Rule on TARP Standards for Compensation and Corporate Governance, the TARP/EESA restrictions on certain executive compensation payments for banks that received TARP funds do not apply if the bank is acquired by an institution that is not itself subject to the TARP/EESA restrictions (regardless of whether the TARP funds are repaid as part of the acquisition), like Capital Bank.   Furthermore, Defendants were aware that the TARP funds were to be repaid at the time of closing of the acquisition at issue; thus, Defendants were aware that the TARP/EESA restrictions would not apply after the closing of the acquisition.

55.    Likewise, nothing in 12 U.S.C. § 1828(k) or 12 C.F.R. Part 359 prohibited or restricted Capital Bank from assuming and agreeing to perform the Agreements.

56.    In other words, nothing would have prevented Southern Community or Capital Bank, as part of Capital Bank's acquisition of Southern Community, from requiring that Capital Bank expressly agree to assume and perform the obligations in the Agreements.

57.    In Southern Community's December 31, 2011 Form 10-K, Southern Community reported to the Securities and Exchange Commission that the Agreements were enforceable and that, "[i]n the event of a control in control of

[Southern Community], as outlined in the [A]greements, the acquirer will be bound by the terms of the [Agreements]."

58.  The December 31, 2011 Form 10-K also contained the following statement by Southern Community: "The [employment] agreements provide for benefits as spelled out in the contracts and cannot be terminated by the Board of Directors, except for cause, without prejudicing the officers' rights to receive certain vested benefits, including compensation."

59.  On July 3, 2012, counsel for Plaintiffs sent a letter to Southern Community explaining that there was no regulatory, statutory, or other legal impediment to Southern Community's fulfilling its obligations under the Employment Agreements and the Salary Continuation Agreements (and the similar agreements of the other employees), noting that Southern Community's proposed amendments were a "material breach" of the Agreements, and demanding "immediate assurance" that Southern Community would perform its contractual obligations.

60.  In response, Southern Community continued to maintain in bad faith that TARP was an impediment, despite its knowledge to the contrary and without even addressing the Interim Final Rule.

**Plaintiffs Were Terminated for Refusing to Waive Their Contract Rights**

61.  Plaintiffs refused to sign the proposed amendments and consistently insisted on Southern Community's compliance with its obligations.

62.   The vast majority of the other 80 or so Bank employees with similar change of control agreements capitulated to Southern Community and signed proposed amendments.

63.   On July 23, 2012, Southern Community informed Plaintiffs that they would be issued notices of termination at 5:00 p.m. EDT the following day unless they signed the proposed amendments before that time.

64.   Plaintiffs refused to sign the proposed amendments, and on July 24, 2012, Southern Community issued notices of termination without cause whereby Southern Community terminated Plaintiffs' employment effective September 22, 2012.  (The Employment Agreements provided for a 60-day notice period.)

65.   The sole reason for Plaintiffs' termination was their refusal to capitulate to Capital Bank's requirement—and hence Defendants' demand—that they give up their contractual rights under the Agreements.

66.   On October 1, 2012, the merger closed.

67.   The merger was clearly covered by the provisions of the Agreements as a "Change in Control."

68.   As part of the merger, and soon after the closing, Southern Community repaid the TARP funds that it had received.

69.   On September 28, 2012, Plaintiffs sent a bill to Capital Bank for Plaintiffs' legal fees in connection with the Agreements, pursuant to the provisions in those Agreements that Southern Community (and Capital Bank as its successor) pay those bills.  Capital Bank refused to pay that bill.

70.     Since their terminations, Plaintiffs have received no payments or benefits of any kind from Defendants other than the accrued vested balance of their Salary Continuation Agreements.

## Plaintiffs Sued the Bank Defendants In North Carolina

71.     On April 26, 2013, Plaintiffs filed a Complaint in the United States District Court for the Middle District of North Carolina, alleging that the federal district court had subject-matter jurisdiction because the Agreements were governed by the Employment Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), and that the court had supplemental jurisdiction to consider Plaintiffs' state-law claims.

72.     On October 28, 2014, the federal court *sua sponte* dismissed the federal Complaint without prejudice for lack of subject matter jurisdiction, concluding that the Agreements were not governed by ERISA, but by state law.  Consistent with the order of the federal court, Plaintiffs re-filed the action (without the ERISA claims) in the appropriate state court, the Superior Court of Forsyth County, *Bauer and Clark v. Southern Community Financial Corporation, et al.,* 14 CVS 7208 (the "State Lawsuit").

73.     On February 12, 2016, Plaintiffs filed an Amended Complaint in the State Lawsuit.  The Amended Complaint with exhibits is part of the administrative record of the FDIC.  *See* attachments to Exhibit 3.

74.     The State Lawsuit contains claims for breach of the Agreements against all of the Bank Defendants (including, importantly, successor liability for

breach of contract against the Capital Defendants), tortious interference with contract and prospective advantage against the Capital Defendants, and unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1 against all of the Bank Defendants.

75.     Defendants moved to dismiss the Amended Complaint in the State Lawsuit under North Carolina Rule of Civil Procedure 12(b)(6), claiming that Plaintiffs had failed to state any claim upon which relief could be granted.  After briefing and a hearing, the Superior Court denied that motion in its entirety on July 8, 2016, and as a result, all of the claims in the Amended Complaint remain.

76.     The State Lawsuit remains pending in the Superior Court of Forsyth County, North Carolina.  Substantial discovery has taken place in that case.  The parties have not yet participated in mandatory, Court-ordered mediation.  The State Lawsuit has been stayed by the state court pending resolution of this case, given the action of the FDIC as described below.

### FACTS REGARDING THE FDIC DETERMINATION AT ISSUE

#### After The State Court Denied Their Motion to Dismiss, the Bank Defendants Turned to the FDIC

77.     On September 9, 2016, counsel for the Bank Defendants wrote to the FDIC and asked for a determination under 12 C.F.R. Part 359 that, among other things, it could not make any payments to the Plaintiffs to settle or satisfy a judgment in the State Lawsuit.  The letter is attached as Exhibit 1.

78.     When counsel for the Plaintiffs discovered on October 13, 2016 that counsel for the Bank Defendants had sent the letter, they promptly sent a letter to

the FDIC noting their disagreement and promising a response.   The letter is attached as Exhibit 2.

79.   On October 24, 2016, counsel for Plaintiffs sent a letter to the FDIC outlining in detail why payment of the damages sought in the State Lawsuit was not prohibited by Part 359 or otherwise.   The letter, with exhibits, is attached as Exhibit 3.

80.   Counsel for Plaintiffs supplemented that response with an additional letter on November 23, 2016.   The letter is attached as Exhibit 4.

81.   On June 13, 2017, the FDIC sent a letter to counsel for Defendants regarding his letter of September 9, 2016.   That letter is attached as Exhibit 5 ("the FDIC Determination").   The FDIC Determination specifically states that it "represents the FDIC's final agency determination concerning the application."   [Ex. 5, p. 1].   Thus, the FDIC Determination by its terms is a "final agency action" under 15 U.S.C. § 704.

82.   The FDIC Determination—which is described in more detail below—concludes, in short, that Bank Defendants are not permitted to make any payment to Plaintiffs in the State Lawsuit, including to settle the State Lawsuit, because any such payment would constitute a prohibited "golden parachute" under 12 C.F.R. Part 359.

**The Bank Defendants Claimed that They Cannot Settle
the State Lawsuit, or Make Any Payments to Plaintiffs
on the Claims Asserted in the State Lawsuit**

83.    Based on the FDIC Determination, the Bank Defendants claim that they cannot settle the claims, or make any payments to Plaintiffs on the claims asserted in the State Lawsuit.  As a result, the parties jointly moved the Forsyth County Superior Court to stay the State Lawsuit pending this action.  A copy of the Order staying the State Lawsuit is attached as Exhibit 6.

## The Golden Parachute Prohibition

84.    The FDIC's authority to regulate golden parachute payments derives from and is limited by 12 U.S.C. § 1828(k).  In that statute, Congress authorized the FDIC "to regulate or prohibit certain forms of benefits to institution-affiliated parties."  Specifically, the statute provides:  "The [FDIC] may prohibit or limit, by regulation or order, any golden parachute payment or indemnification payment."

85.    In the statute, Congress specifically and unambiguously defined what constitutes a "golden parachute payment" subject to prohibition or limitation by the FDIC:

> The term "golden parachute payment" means any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or covered company for the benefit of any institution-affiliated party pursuant to an obligation of such institution or covered company that—
>
> (i)    is contingent on the termination of such party's affiliation with the institution or covered company; **and**
>
> (ii)    is received on or after the date on which—
> . . .
> (III)   the institution's appropriate Federal banking agency determines that the insured depository institution is in a troubled condition (as defined in the regulations prescribed pursuant to section 32(f) . . .).

25

12 U.S.C. § 1828(k)(4) (emphasis added).

86.    It is undisputed that Bauer and Clark are "institution-affiliated parties," or IAPs.   It is also undisputed that Southern Community Bank and Southern Community Financial Corporation were in "troubled condition" during and after 2011.   It is also undisputed that Capital Bank and its affiliated entities were never in troubled condition.   It is also undisputed that First Horizon and First Tennessee were never in troubled condition.   It is also undisputed that neither the "assume and agree to perform" obligation in the Agreements nor the attorney fees provision in the Agreements was contingent on the termination of Plaintiffs' affiliation with Southern Community or Capital Bank.

87.    The FDIC promulgated Part 359 in 1996.

88.    Part 359 defines "golden parachute payment" as follows:

(1) The term golden parachute payment means any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or an affiliated depository institution holding company for the benefit of any current or former IAP pursuant to an obligation of such institution or holding company that:

>    (i) Is contingent on, or by its terms is payable on or after, the termination of such party's primary employment or affiliation with the institution or holding company; **<u>and</u>**

>    (ii) Is received on or after, or is made in contemplation of, any of the following events:

>>    (A) The insolvency (or similar event) of the insured depository institution which is making the payment or bankruptcy or insolvency (or similar event) of the depository institution holding company which is making the payment; or

(B) The appointment of any conservator or receiver for such insured depository institution; or

(C) A determination by the insured depository institution or depository institution holding company's appropriate federal banking agency, respectively, that the insured depository institution or depository institution holding company is in a troubled condition, as defined in the applicable regulations of the appropriate federal banking agency (§ 303.101(c) of this chapter); or

(D) The insured depository institution is assigned a composite rating of 4 or 5 by the appropriate federal banking agency or informed in writing by the Corporation that it is rated a 4 or 5 under the Uniform Financial Institutions Rating System of the Federal Financial Institutions Examination Council, or the depository institution holding company is assigned a composite rating of 4 or 5 or unsatisfactory by its appropriate federal banking agency; or

(E) The insured depository institution is subject to a proceeding to terminate or suspend deposit insurance for such institution; **and**

(iii).

(A) Is payable to an IAP whose employment by or affiliation with an insured depository institution is terminated at a time when the insured depository institution by which the IAP is employed or with which the IAP is affiliated satisfies any of the conditions enumerated in paragraphs (f)(1)(ii) (A) through (E) of this section, or in contemplation of any of these conditions; or

(B) Is payable to an IAP whose employment by or affiliation with an insured depository institution holding company is terminated at a time when the insured depository institution holding company by which the IAP is employed or with which the IAP is affiliated satisfies any of the conditions enumerated in paragraphs (f)(1)(ii)(A), (C) or (D) of this section, or in contemplation of any of these conditions.

12 C.F.R. § 359.1(f) (emphasis added).

### Unbeknownst to Plaintiffs at the Time, the Bank Defendants Had Attempted to Get the FDIC to Disapprove Payments to Plaintiffs in 2012

89.     Part 359 also provides a mechanism for insured institutions to seek permission from the FDIC to make certain payments that would otherwise be golden parachutes.

90.     During discovery in the State Lawsuit, Plaintiffs learned for the first time that counsel for Southern Community had written to the FDIC on September 6, 2012—prior to the effective date of Southern Community's termination of Plaintiffs' employment—under the guise of seeking permission to make certain payments to the Plaintiffs.  That letter is attached as Exhibit 7.

91.     In that letter, Southern Community claimed that it could not make the certification required for an exemption to the supposed prohibition on making such payments, namely, that Plaintiffs were not "substantially responsible" for Southern Community being in its troubled condition under 12 C.F.R. § 359.4(a)(4)(ii).  So, this letter was not an attempt by Southern Community to actually get permission from the FDIC to make any payments to Plaintiffs, as the FDIC regulations contemplated; rather, the letter was a transparent attempt to get a decision from the FDIC that such payments could *not* be made.

92.     On September 17, 2012, the FDIC responded in an email that, because Defendants did not provide the required certification, the supposed application for permission to make any such payments was incomplete.   The FDIC made no

determination at all, including no determination that any provision in Plaintiffs' Agreements was a "golden parachute."

93.     Upon information and belief, no further correspondence was exchanged between the Bank Defendants and the FDIC regarding that issue between September 17, 2012 and September 9, 2016.

**The FDIC Issued a Final Agency Determination that the Bank Defendants Cannot Settle the State Lawsuit or Make Any Payments to Plaintiffs on the Claims Asserted in the State Lawsuit**

94.     On June 13, 2017, the FDIC sent the FDIC Determination to Defendants.    [Ex. 5].    The FDIC Determination specifically states that it "represents the FDIC's final agency determination concerning the application."  [Ex. 5, p. 1].

95.     The FDIC Determination concludes, in short, that the Bank Defendants are not permitted to pay anything to Plaintiffs based on any of Plaintiffs' claims in the State Lawsuit.

**The State Lawsuit Does Not Seek Payment by a Troubled Institution**

96.     The State Lawsuit does not seek (except as alternative relief) payment of amounts that should have been paid by Southern Community to Plaintiffs as a result of Southern Community's termination of Plaintiffs' employment in July, 2012.    On the contrary, the State Lawsuit seeks damages against the Bank Defendants for their breach of the Agreements by refusing to ensure that Capital Bank assume and agree to perform the Agreements with Plaintiffs—as expressly required by the Agreements—in the binding Merger Agreement executed in March

29

2012 and thereafter.  [*See* Ex. 3, Att. 1, ¶¶ 92, 93, 100, 101 (Amended Complaint)]. The State Lawsuit also seeks damages against Capital for tortiously interfering with Plaintiffs' Agreements with Southern Community.  [Ex. 3, Att. 1, ¶¶ 112-133].

97.    Had Southern Community not succumbed to Capital's interference— had Southern Community not breached the Agreements by failing to ensure that the successor assume and agree to perform the Agreements—Plaintiffs would have continued their affiliation and employment with Southern Community, and upon closing of the merger, Plaintiffs would have been affiliated with and employed on the same terms by the non-troubled merged entity, which would have assumed Southern Community's obligations under the Agreements.

98.    Thus, any continued employment and payment obligations after the assumption of the Agreements by Capital would have been the obligations of an institution that was *never* in troubled condition.  That is, all of the payment obligations at issue in the State Lawsuit and in the FDIC Determination would have been the payment obligations of a non-troubled institution.

99.    12 U.S.C. § 1828(k)(4)'s definition of "golden parachute payment" is unambiguous, clear, and conclusive.  It includes payments to an IAP only when the ***paying institution*** has been determined to be in troubled condition or otherwise fulfills one of the criteria in § 1828 (k)(4)(A)(ii)(I-V).  It is undisputed that Capital and Capital Holding (and now First Horizon and First Tennessee) have never been in troubled condition or fulfilled such criteria.  Plaintiffs' Agreements do not provide for payment from any troubled institution.

100.   Nothing in Congress's definition of "golden parachute payment" implicates any payment by a non-troubled institution that does not fulfill any of the criteria in § 1828(k)(4)(A)(ii)(I-V).

101.   Likewise, 12 C.F.R. § 359.1(f)'s definition of "golden parachute payment" includes only payments by an institution to an IAP after the ***paying institution*** has been determined to be in troubled condition or otherwise fulfills one of the criteria in § 359.1(f)(ii)(A)-(E) or § 359.1(f)(iii)(A)-(B).   It is undisputed that Capital and Capital Holding (and now First Horizon and First Tennessee) have never been in troubled condition or fulfilled such criteria.

102.   Nothing in the FDIC's definition of "golden parachute payment" implicates any payment by a non-troubled institution that does not fulfill any of the criteria in § 359.1(f)(ii)(A)-(E) or § 359.1(f)(iii)(A)-(B).

103.   This non-limitation on payments by healthy acquirers is consistent with the approach of the Treasury Department's treatment of healthy acquirers in regulations established as part of TARP.   The Treasury Department's Interim Final Rule expressly provides that if a recipient of TARP funds (like Southern Community) is acquired by another bank that has not received TARP funds (like Capital Bank), then "employees of the target who are SEOs [senior executive officers] or most highly compensated employees [like Bauer and Clark] subject to section 111 immediately prior to the acquisition who continue employment with the acquirer will no longer be subject to section 111 of EESA after the acquisition."   74 Fed. Reg. 28394 (15 June 2009) § 30.14.   And that makes sense: there is no reason

to prevent healthy acquirers from making those payments, and there is good reason to incentivize them to be able to do so, so that troubled banks will seek out and facilitate their acquisition by healthy acquirers.

104.   The FDIC Determination stated: "The FDIC has consistently maintained that golden parachute payments by a healthy acquirer are subject to the Golden Parachute Rules to prevent IAPs from circumventing the golden parachute regulation as a result of the timing or the structure of a purchase by a healthy acquirer."  [Ex. 5, p. 5].

105.   This determination is contrary to Congress's unambiguous, clear, and conclusive definition of "golden parachute payment" and contrary to the FDIC's own regulation.   No statute or regulation prohibits or limits payments by healthy successors or acquirers of troubled institutions.

### The State Lawsuit Does Not Seek Payments That Were Contingent on Termination of Bauer and Clark's Affiliation or Employment with Southern Community

106.   12 U.S.C. § 1828(k)(4)(A)(1) includes in the unambiguous, clear, and conclusive definition of "golden parachute payment" only "any payment (or any agreement to make any payment in the nature of compensation . . . that is contingent on the termination of [the IAP's] affiliation with the institution or covered company."

107.   12 C.F.R. § 359.1(f) includes in the definition of "golden parachute payment" only "any payment (or any agreement to make any payment) in the nature of compensation . . . that:  (i) Is contingent on, or by its terms is payable on

or after, the termination of such party's primary employment or affiliation with the institution or holding company."

108.   Neither the "Change in Control Benefits" nor the attorney fees provisions in Plaintiffs' Agreements were contingent on, or by their terms payable on or after, the termination of Plaintiff's primary employment or affiliation with Southern Community.   [*See* Ex. 3, Att. 1 (Amended Complaint in State Lawsuit), Exs. 1-4 (Employment Agreements, ¶¶ 5.1, 5.4, 8.9; Salary Continuation Agreements, ¶ 2.4)].

109.   The FDIC Determination analyzed the payments based not on the terms of the relevant agreements, *i.e.,* whether any payment was "contingent on, or *by its terms* payable on or after" termination, but based on the date of the *actual,* unlawful termination of Plaintiffs' employment by Southern Community at the insistence of Capital.   That is, the FDIC stated:   "The Bank and SCFC terminated Bauer and Clark's employment on July 24, 2012 (effective September 22, 2012), at a time when they were in troubled condition.   The change-in-control payments meet the golden parachute payment definition of 12 C.F.R. §§ 359.1(f)(1)(iii)."   [Ex. 5, p. 4].[3]

---

[3] The FDIC attempted to shoehorn its Determination into the "by its terms payable" language of the regulation by noting that, given that Southern Community actually fired Plaintiffs before the change in control, any payments would have *actually been paid* after termination:   "The change-in-control payments sought in the State Court Action arise directly from the Agreements and the SCAs and under their terms would have been paid to Bauer and Clark at or following their termination."   Ex. 5, p. 4.

110.   This arbitrary and capricious determination is contrary to Congress's unambiguous, clear, and conclusive definition of "golden parachute payment" and contrary to the FDIC's own regulation.   No statute and no regulation prohibits or limits payments to Plaintiffs that were not contingent on, or by their terms payable on or after, the termination of Plaintiffs' affiliation or employment with Southern Community.

### The Attorney Fees and Expenses Sought in the State Lawsuit Are Not Payments "in the Nature of Compensation"

111.   12 U.S.C. § 1828(k)(4)(A)(1) includes in the unambiguous, clear, and conclusive definition of "golden parachute payment" only "any payment (or any agreement to make any payment) in the nature of compensation . . . ."

112.   12 C.F.R. § 359.1(f) likewise includes in the definition of "golden parachute payment" only "any payment (or any agreement to make any payment) in the nature of compensation . . . ."

113.   Congress's inclusion of the limitation "in the nature of compensation" was intended to exclude from the definition of "golden parachute payment" all payments that are not "in the nature of compensation."

114.   The attorney fees and expenses provisions in the Agreements do not provide for payments "in the nature of compensation," but for reimbursement for specific legal expenses incurred by Plaintiffs as a result of Southern Community's breach of its obligations under those Agreements.

115.   The FDIC Determination stated that the attorney fees provisions are prohibited golden parachute payments because they "confer benefit upon Bauer and

Clark," notwithstanding that they are not "in the nature of compensation." [Ex. 5, pp. 7-8].

116.    This determination is contrary to Congress's unambiguous, clear, and conclusive definition of golden parachute payment and contrary to the FDIC's own regulation.  No statute or regulation prohibits or limits payments to Plaintiffs that were not in the nature of compensation.

## FIRST CLAIM FOR RELIEF
(Declaratory Judgment)

117.    All preceding paragraphs are incorporated by reference.

118.    This is an action under the Administrative Procedure Act, 5 U.S.C. §§ 701-06 (the "APA"), for a determination that the FDIC Determination is unlawful and to set it aside for all purposes.

119.    The FDIC Determination is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

120.    The FDIC Determination is in excess of the FDIC's statutory jurisdiction, authority, or limitations.

121.    The FDIC Determination is based on a regulation that does not exist and hence without observance of procedure required by law.

122.    The FDIC Determination is unwarranted by the undisputed facts.

123.    The FDIC Determination is contrary to Plaintiffs' constitutional rights.

124.    The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The

FDIC Determination violated this provision because it was not in accordance with the clear definition of "golden parachute payment" established by Congress, or even with the definition of "golden parachute payment" promulgated by the FDIC.

125.   The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). The FDIC is not permitted to interpret "golden parachute payment" in a manner more expansively than Congress unambiguously, clearly, and conclusively defined it. *Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 781-82 (2018).

126.   The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "without observance of procedures required by law." 5 U.S.C. § 706(2)(D). Before it may promulgate a binding rule, the FDIC must provide public notice in accordance with law and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553. FDIC has never followed such procedures to promulgate a rule extending the definition of "golden parachute payment" to include (a) payments by non-troubled acquirers; (b) payments that are not contingent on the termination of the IAP's affiliation with the paying institution; or (c) payments that are not in the nature of compensation.

127.   The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "unwarranted by the facts to the extent

that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706(2)(F). The undisputed facts of the underlying case demonstrate that the FDIC Determination is unwarranted.

128. The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions" that are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). In addition, this Court has authority under 28 U.S.C. § 1331 and its inherent powers of equity to declare invalid and to enjoin agency action that violates the Constitution. By basing its Determination on alleged agency practices that the "FDIC has consistently maintained" and criteria other than the unambiguous, clear, and conclusive language of 12 U.S.C. § 1828(k) or even its own regulations, the FDIC has deprived Plaintiffs of property without due process of law.

129. Plaintiffs are entitled to (a) a declaratory judgment that the FDIC Determination is unlawful and of no effect, and nullifying the six determinations on page 8 of the FDIC Determination, and (b) an order setting aside the FDIC Determination in its entirety.

130. Plaintiffs are entitled to a declaratory judgment that nothing in the Part 359 or 12 U.S.C. § 1828(k) prohibits or limits in any respect the payment of a settlement or a judgment in the State Lawsuit by Southern Community's successors; that such payments are not subject to these provisions; and that such payments by Southern Community's successors are not otherwise prohibited.

## SECOND CLAIM FOR RELIEF
(Injunctive Relief)

131.    All preceding paragraphs are incorporated by reference.

132.    Plaintiffs are entitled to a permanent injunction enjoining the FDIC from taking any action to enforce, implement, or apply the FDIC Determination.

WHEREFORE, Plaintiffs F. Scott Bauer and Jeffrey T. Clark pray for an Order and Judgment:

1.    Declaring that the FDIC Determination is unlawful and setting it aside in its entirety;

2.    Declaring that nothing in 12 U.S.C. § 1828(k) or Part 359 prohibits or limits in any respect the payment of a settlement or a judgment in the State Lawsuit by Southern Community's successors;

3.    Making such other declarations as may be necessary to invalidate the FDIC Determination;

4.    Enjoining the FDIC from taking any action to enforce, implement, or apply the FDIC Determination;

5.    Awarding Plaintiffs attorney fees and expenses pursuant to applicable law;

6.    Taxing the costs of this action to the FDIC; and

7.    Granting such other and further relief as is necessary to effectuate the above relief or as the Court otherwise deems just and proper.

Respectfully submitted this the 21st day of December, 2018.

/s/ Christopher T. Graebe
Christopher T. Graebe, Bar ID NC00007
GRAEBE HANNA & SULLIVAN, PLLC
4350 Lassiter at North Hills Ave., Suite 375
Raleigh, North Carolina 27609
Telephone:   919-863-9092
Fax:             919-424-6407
Email:          cgraebe@ghslawfirm.com


/s/ M. Todd Sullivan
M. Todd Sullivan, NCSB No. 24554
GRAEBE HANNA & SULLIVAN, PLLC
4350 Lassiter at North Hills Ave., Suite 375
Raleigh, North Carolina 27609
Telephone:   919-863-9090
Fax:             919-863-9095
Email:          tsullivan@ghslawfirm.com


/s/ Mark R. Sigmon
Mark R. Sigmon, NCSB No. 37762
SIGMON LAW, PLLC
5 W. Hargett St., Suite 1001
Raleigh, North Carolina 27601
Telephone:   919-451-6311
Fax:             919-882-9057
Email:          mark@sigmonlawfirm.com

*Counsel for Plaintiffs*