## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT BAUER, *et al.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | **Civil Case No. 18-3047 (RJL)** |
| ) | |
| FEDERAL DEPOSIT INSURANCE ) | |
| CORPORATION, *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

**FILED**

**SEP 1 1 2020**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

### MEMORANDUM OPINION

(September *10th*, 2020) [Dkt. ## 20, 22, 23]

Plaintiffs Scott Bauer and Jeffrey Clark ("plaintiffs") were former senior executives at Southern Community Bank and Trust ("the Bank") and its parent company, Southern Community Financial Corporation ("SCFC"). Plaintiffs sued the Bank and SCFC (collectively, "Southern Community"), as well as their successors, Southern Community Financial, LLC, Winston 23 Corporation, Capital Bank Corporation, Capital Bank, N.A., First Horizon National Corporation, and First Tennessee Bank National Association (collectively with Southern Capital, "Bank Defendants"), in North Carolina state court (the "state court litigation") alleging contract, tort, and statutory claims. While that case was being litigated, some of the Bank Defendants sought a "final determination" from the Federal Deposit Insurance Corporation ("FDIC"), pursuant to 12 C.F.R. § 303.244, concerning whether the relief sought by plaintiffs in the state court litigation constitutes a prohibited golden parachute. The FDIC opined that all relief sought in the state court

1

litigation was prohibited under the golden parachute regulations.  Plaintiffs brought the present action against the FDIC and Bank Defendants (collectively, "defendants") under the Administrative Procedure Act, seeking this Court's review of the FDIC's final determination.  Before this Court are the parties' cross-motions for summary judgment, wherein defendants request that the Court affirm the FDIC's final determination and plaintiffs seek an order vacating the same, along with injunctive and declaratory relief.  *See* Pls.' Mot. for Summ. J. [Dkt. #23] ("Pls.' Mot."); Bank Defs.' Mot. for Summ. J. [Dkt. # 20] ("Bank Defs.' Mot."); FDIC's Mot. for J. on the Admin. R [Dkt. # 22] ("FDIC's Mot."). I asked the parties to submit supplemental briefing on an issue not raised in their cross-motions, namely whether the FDIC acted outside of its regulatory authority by issuing its decision based on hypothetical payments.  *See* Minute Order (June 10, 2020).  The parties responded.  *See* Pls.' Supp. Br. [Dkt. # 39]; Bank Defs.' Supp. Br. [Dkt. # 35]; FDIC's Supp. Br. [Dkt. # 36].  For the following reasons, plaintiffs' motion for summary judgment [Dkt. # 23] is **GRANTED IN PART** to the extent it requests that the Court vacate the FDIC's decision **AND DENIED IN PART AS MOOT** to the extent that it asks for declaratory and injunctive relief.  Further, defendants' motions for summary judgment [Dkt. ## 120, 22] are **DENIED**.

## BACKGROUND

### I.     Procedural History

As senior executives at Southern Community Bank and Trust and its parent company, Southern Community Financial Corporation, plaintiffs entered into various employment and benefits agreements (collectively, "Agreements") with Southern

Community in 2006.  Pls.' Mot. at 4 (Administrative Record ("AR") 219, 248, 273, 301);

Bank Defs.' Mot. at 3 (AR 920-48, 949-73, 974-1001, 1002-27); FDIC's Mot. at 5-6 (AR

219-47, 248-69, 273-300, 301-23).

Those Agreements permit the Bank to terminate plaintiffs without cause upon 60

days' written notice. *See* Employment Agreement, § 3.1(b) (AR 224, 278).   If terminated

without cause, plaintiffs are entitled to their base salary for the unexpired term of the

employment agreement ("Termination Benefits"). *See* Employment Agreement, §§ 3.1(b),

4.4 (AR 224, 228, 278, 280-81).   If a "change in control" occurs during the term of the

agreement, plaintiffs are entitled to a lump-sum of three times their annual compensation

("Change-in-Control Benefits").  *See* Employment Agreement, § 5.1 (AR 229, 281-82).

Plaintiffs can receive *either* Change-in-Control Benefits *or* Termination Benefits.  *See*

Employment Agreement, § 5.3 (AR 230, 283).   The Agreements also state that the Bank

"shall require any successor … to expressly assume and agree to perform this Employment

Agreement in the same manner and to the same extent" as Southern Community (the

"Assume and Agree to Perform Provision"). *See* Employment Agreement, § 8.1 (AR 237,

289); *see also* Salary Continuation Agreements, Art. 7 (AR 260, 315).   Finally, the

Agreements provide that the Bank shall reimburse the "fees and expenses of counsel"

retained to enforce plaintiffs' Change-in-Control Benefits up to $500,000.  *See*

Employment Agreements, § 8.9 (AR 239-40, 291-92); *see also* Salary Continuation

Agreements, § 7.13 (AR 261, 316).

The Bank experienced such financial difficulties during the recession of 2008 that

it qualified as being in "troubled condition" as defined in 12 C.F.R. § 303.101(c).  Pls.'

Mot. at 6 (AR 1056); Bank Defs.' Mot. at 4, 6-7 (AR 79); FDIC's Mot. at 6-7.  As such, the Bank entered a Consent Order with the FDIC in February 2011, which placed restrictions on executive payments, including restrictions to golden parachute payments. Pls.' Mot. at 6 (AR 1056); Bank Defs.' Mot. at 4, 6-7 (AR 79, 697-722); FDIC's Mot. at 6-7 (AR 107-52).

On March 26, 2012, SCFC entered into an agreement to merge with Capital Holding ("Capital").  Pls.' Mot. at 7 (AR 383-462); Bank Defs.' Mot. at 9 (AR 383-462); FDIC's Mot. at 7; *see also* AR 463-67 (Amended Merger Agreement (June 25, 2012)).  The merger agreement required Southern Community to amend or waive executives' change-in-control benefits. Pls.' Mot. at 7 (AR 452, 1056); Bank Defs.' Mot. at 9 (AR 452); FDIC's Mot. at 7 (AR 452).  Plaintiffs, however, refused to amend their existing Agreements.  Pls.' Mot. at 10-11; Bank Defs.' Mot. at 10; FDIC's Mot. at 8.  As such, on July 24, 2012, the Southern Community boards of directors fired plaintiffs, effective on September 22, 2012—some nine days *prior* to the closing of the merger.  Pls.' Mot. at 10-11; Bank Defs.' Mot. at 10 (AR 658-60); FDIC's Mot. at 8 (AR 176).

In November 2014, plaintiffs sued Southern Community and its successors in North Carolina state court, asserting breach of the Agreements, unlawful termination, tortious interference with contract, tortious interference with prospective economic advantage, and unfair and deceptive trade practices claims, as well as declaratory judgment regarding the attorneys' fees provision.  Pls.' Mot. at 11-12; Bank Defs.' Mot. at 12-13; FDIC's Mot. at 8; *see also* Am. Compl. ¶¶ 89-133, *Bauer v. Southern Community Financial Corp.*, 14 CVS 7208 (Forsyth County Superior Court, N.C Feb. 11, 2016) ("State Court Litigation Am.

4

Compl.") (AR 909-34).  Plaintiffs' complaint does not assert, however, a fixed amount of damages, nor does it assert a specific range of damages.  *See* State Court Litigation Am. Compl.; FDIC's Supp. Br. at 5 n.2.  Bank Defendants moved to dismiss plaintiffs' amended complaint under North Carolina Rule of Civil Procedure 12(b)(6), but the North Carolina Superior Court denied the motion in its entirety on July 8, 2016.   Pls.' Mot. at 11-12 (AR 178); Bank Defs.' Mot. at 13.

On September 9, 2016, certain of the Bank Defendants[1] filed an "application" with the FDIC requesting a final determination concerning the disputed payments in the state court litigation pursuant to 12 C.F.R. § 303.244.  Pls.' Mot. at 12 (AR 173-81); Bank Defs.' Mot. at 13 (AR 173-81); FDIC's Mot. at 9.  Plaintiffs provided their own submission.  Pls.' Mot. at 12 (AR 879-1028, 1029-37); FDIC's Mot. at 9 (AR 877-78, 879-1027).   Bank Defendants submitted six questions to the FDIC, including, as relevant here: (1) whether the relief plaintiffs seek in the state court litigation is subject to the golden parachute limitations; (2) whether the golden parachute restrictions would apply to payments made to plaintiffs by Capital after its merger with Southern Community; (4) whether tort and statutory claims arising from the same alleged contract breaches are subject to the golden parachute restrictions; and (5) whether the attorneys' fees qualify as golden parachutes.[2] (AR 180-81).

---

[1] Namely, Southern Community Financial Corporation, Southern Community Financial, LLC, Southern Community Bank and Trust, Winston 23 Corporation, Capital Bank Corporation, Capital Bank Financial Corp., and Capital Bank, N.A.  (AR 173).

[2] Plaintiffs' complaint in this case seeks review of all six determinations, but plaintiffs changed course in their briefing, stating, "If this Court agrees with the FDIC [regarding

The FDIC issued its opinion in June 2017 (the "final determination"), concluding: (1) the golden parachute limitations apply to all of the relief sought by plaintiffs in the state court litigation; (2) the golden parachute restrictions prohibited Capital from making golden parachute payments to plaintiffs after the merger; (4) under the facts of the state court litigation, the tort and statutory claims are subject to the golden parachute restrictions; and (5) the attorneys' fees are subject to the golden parachute restrictions. Pls.' Mot. at 12 (AR 1054-61, 1062-69); Bank Defs.' Mot. at 14-17 (AR 1069); FDIC's Mot. at 9 (AR 1054-61, 1062-69).[3]

The parties moved to stay the state court litigation so that plaintiffs could bring the present action. Pls.' Mot. at 13; Bank Defs.' Mot. at 17; FDIC's Mot. at 8. In December 2018, plaintiffs filed this action against the FDIC and Bank Defendants challenging the FDIC's final determination. Compl. [Dkt. # 1]. The parties cross-moved for summary judgment. Pls.' Mot.; Bank Defs.' Mot.; FDIC's Mot. Pursuant to Federal Rule of Civil Procedure 56(f)(2), the Court requested that the parties submit supplemental briefing concerning "[w]hether the FDIC acted inconsistently with 12 C.F.R. § 303.244 by issuing a decision about hypothetical damages payments or settlement payments at issue in the ongoing North Carolina state court action." *See* Minute Order (June 10, 2020). The parties responded. Pls.' Supp. Br.; Bank Defs.' Supp. Br.; FDIC's Supp. Br. The parties' motion,

---

Golden Parachute payments], plaintiffs do not seek review of the FDIC's separate determination[s] [Nos. 3 and 6]." Pls.' Opp. to FDIC at 3 [Dkt. # 25].
[3] The FDIC issued two, substantially identical letters, one for Bauer and one for Clark. Record citations will be to the Bauer version of the letter.

as well as the issue posed by the Court, are now ripe for review.  The state court litigation

remains stayed in the meantime.

## II.    Statutory Scheme

Under 12 U.S.C. § 1828(k), "the [FDIC] may prohibit or limit, by regulation or

order, any golden parachute payment or indemnification payment" to institution-affiliated

parties ("IAPs"), including directors and employees of the insured bank. 12 U.S.C.

§ 1828(k).  As relevant here, "golden parachute payment" means:

> [A]ny payment (or any agreement to make any payment) in the nature
> of compensation by any insured depository institution or covered
> company for the benefit of any institution-affiliated party pursuant to
> an obligation of such institution or covered company that: … is
> contingent on, or by its terms payable on or after, the termination of
> such party's affiliation with the institution or holding company; and
> … is received on or after … [the date on which] the insured depository
> institution or depository institution holding company is in troubled
> condition ….

12 C.F.R. § 359.1(f).

"A procedure is also set forth whereby an institution or IAP can request permission

to make what would otherwise be a prohibited golden parachute payment."  12 C.F.R.

§ 359.0(b).  Section 303.244 "contains the procedure to file for the FDIC's consent when

such consent is necessary under part 359 of this chapter." 12 C.F.R. § 303.244.

Section 303.244 states that a letter application must be submitted to the appropriate

FDIC regional director.  *Id.* § 303.244(b).  That letter "shall contain:"

> (1) The reasons why the applicant seeks to make the payment;
>
> (2) An identification of the institution-affiliated party who will receive
> the payment;

(3) A copy of any contract or agreement regarding the subject matter of the filing;

(4) The cost of the proposed payment and its impact on the institution's capital and earnings;

(5) The reasons why the consent to the payment should be granted; and

(6) Certification and documentation as to each of the points cited in § 359.4(a)(4).

*Id.* § 303.244(c). The FDIC may request additional information, and the FDIC provides the requesting party with "a subsequent written notification of the final action taken as soon as the decision is rendered." *Id.* §§ 303.244(d), (e).

## ANALYSIS

### I.    Standard of Review

"'Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record,'" as it is here. *Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (quoting *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995)). In such cases, the district court "sits as an appellate tribunal" and "the entire case … is a question of law." *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (quotations omitted).

The Administrative Procedure Act ("APA") requires a district court to "hold unlawful and set aside agency action, findings, and conclusions" that are: "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" 5 U.S.C. § 706(2)(A); "contrary to constitutional right, power, privilege or immunity[,]" *id.* § 706(2)(B); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

right[,]" *id.* § 706(2)(C); or "without observance of procedure required by law," *id.* § 706(2)(D).

## II.     The FDIC Acted Outside of its Regulatory Authority by Issuing a "Final Determination" Pursuant to § 303.244 About Hypothetical Payments Still Under Litigation in North Carolina.

As an initial matter, I must assess whether the FDIC actually had the authority to issue a final decision when, as occurred here, the FDIC's opinion was based on hypothetical payments in ongoing litigation.  While the parties did not raise this issue in their original briefing, I ordered the parties to submit supplemental briefing on this topic, *see* Minute Order (June 10, 2020), and the parties fully briefed the issue, thereby satisfying the apposite Federal Rule of Civil Procedure, Fed. R. Civ. P. 56(f).

### A. The Regulation is Not Ambiguous.

In defining the scope of the FDIC's authority, I must first determine what deference, if any, to afford the FDIC's interpretation of its own regulation.  *Auer* deference "can arise only if a regulation is genuinely ambiguous." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). A regulation is only "genuinely ambiguous" when uncertainty exists "even after a court has resorted to all the standard tools of interpretation," including evaluation of the "text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.* at 2414-15.  "If uncertainty does not exist, there is no plausible reason for deference.  The regulation then just means what it means—and the court must give it effect, as the court would any law." *Id.* at 2415.

Fortunately, § 303.244 is not ambiguous.  It states that the requesting party *must* provide the FDIC with, among other information, "the cost of the proposed payment and

9

its impact on the institution." 12 C.F.R. § 303.244(c)(4).  I must, of course, give the words "proposed" and "cost" their ordinary meaning in the phrase "cost of the proposed payment." *See Propose*, Merriam-Webster, https://www.merriam-webster.com/dictionary/propose (last visited Sept. 10, 2020) ("to form or put forward a plan or intention"); *Cost*, Merriam-Webster, https://www.merriam-webster.com/dictionary/cost (last visited Sept. 10, 2020) ("the amount of equivalent paid or charged for something"). This phrase makes clear that § 303.244 requires the IAP or regulated bank to put forward the planned, actual amount of the golden parachute.  This language does *not* permit a requesting party to submit a hypothetical payment from *ongoing* litigation, where the final amount of damages (or settlement) is, as yet, unknown.

Not surprisingly, the remainder of §303.244(c)(4) supports this plain reading.  It requires the requesting party to submit the payment's "impact on the institution's capital and earnings."  12 C.F.R. § 303.244(c)(4).  It is only rationale that the requesting party must know the actual amount of the golden parachute in order to provide the FDIC with the golden parachute payment's "impact on the institution."

Thus, the plain text of § 303.244 forecloses an interpretation that would permit the FDIC to make a final determination on a hypothetical payment that might be forthcoming from ongoing litigation.  Instead, the regulation requires that a requesting party submit, among other information, the actual, proposed cost of the golden parachute payment, along with its impact on the regulated institution, so that the FDIC can assess the proposed payment and properly exercise its discretion.

### A. The FDIC's Interpretation is Unpersuasive.

If an agency's regulation is not ambiguous, a court "should not give deference to an agency's reading, except to the extent it has the power to persuade.'" *Wilkie*, 139 S. Ct. at 2414 (quotations and citations omitted). In its response to the Court's Minute Order requesting supplemental briefing, the FDIC amazingly argues that its regulations permit it to review *potential* golden parachute payments that are not fixed amounts.[4] FDIC's Supp. Br. at 4-5. Specifically, the FDIC argues that the statute defines "payment," as used in the term "golden parachute payment," as "any payment (or any agreement to make any payment) in the nature of compensation." *Id.* 4 (citing 18 U.S.C. § 1828(k)(4)(A); 12 C.F.R. § 359.0(b)). According to the FDIC, because "[m]any 'agreements' do not tabulate fixed damages in event of breach," "[r]equiring a liquidated payment amount for the 'golden parachute' restrictions to activate goes against the statute's plain meaning." *Id.* at 5. Horsefeathers!

Even a broad definition of the term does *not* encompass purely hypothetical payments. Indeed, while the term "payment" can be fairly interpreted to apply to both "direct and indirect transfer of any funds," *see* 12 C.F.R. § 359.1(k)(1), or even to any benefit "in the nature of compensation," *see Harrison v. Ocean Bank*, 614 F. App'x 429, 438 (11th Cir. 2015), or to agreements to make actual payments, *see* 12 U.S.C. §

---

[4] Unsurprisingly, perhaps, the parties all take the position that the FDIC did not exceed its regulatory authority by issuing its decision on hypothetical payments. *See* Joint Response to Parties' Memoranda in Response to Court's Minute Order of June 10, 2020 [Dkt. # 38]. After all, in some quarters, pragmatism trumps legal rigor!

1828(k)(4)(A), the FDIC does not, and cannot, cite authority that would extend the term "payment" to include hypothetical payments that are not yet known to the parties.

Further, the FDIC's interpretation ignores the surrounding text in § 303.244. Somehow the FDIC ignores the phrase "cost of the proposed" that proceeds "payment." *See Market Co. v.* Hoffman, 101 U.S. 112, 115-16 (1879) ("As early as in Bacon's Abridgment, sect. 2, it was said that 'a statute ought upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."). Obviously, the plain meaning of that phrase *necessitates* that the payment submitted to the FDIC be an actual, proposed payment.

The FDIC also argues that—because other courts have reviewed and affirmed the FDIC's determinations involving ongoing, underlying litigation or settlement of unlitigated claims—this Court should "do the same." FDIC's Supp. Br. at 5-6 (citing *Von Rohr v. Reliance Bank*, 826 F.3d 1046, 1053 (8th Cir. 2016); *Harrison*, 614 F. App'x at 437). I disagree. First of all, the Eight Circuit in *Von Rohr* never addressed the issue raised by my Minute Order, and I will not, of course, take the Eighth Circuit's silence as tacit approval. Moreover, the Eighth Circuit actually noted that the FDIC *knew* the amount of the specific proposed payment ($405,000). *Id.* at 1049, 1053 n.5. The parties here, by contrast, cannot even agree on a specific *range* of the payment!

As for the *Harrison* case—while the FDIC is correct that the settlement involved unlitigated claims—the FDIC in that case knew the specific amounts of the potential golden parachute ($1,000,000), as well as the terms of the settlement agreement, so that it could

12

assess whether the payment was within the purview of the golden parachute restrictions. *Harrison*, 614 F. App'x at 432.  Not so here.[5]

As such, an interpretation here that would permit the FDIC to evaluate hypothetical damages from ongoing litigation—in place of an actual, proposed payment—is not only unsupported by the plain text of the regulations, it defies common sense.[6]

Indeed, the present litigation demonstrates the practical pitfalls of the FDIC's interpretation in supporting an advisory "final determination."  The parties spilled much ink in their briefing before this Court arguing that the opposing side was misinterpreting plaintiffs' claims in the state court litigation.  Plaintiffs describe their tort and contract claims as creating a "but for" world in which they were never fired from Southern Community and continued as gainful employees of Capital until they were either fired by Capital (and entitled to Termination Benefits) or a change-in-control occurred (along with those benefits).  Pls.' Mot. at 2-3, 28-30 (describing the state court litigation claims). Plaintiffs emphatically contend that they are entitled to damages—under the Assume and Agree to Perform Provision—that fall outside the golden parachute restrictions under these

---

[5] To be clear, I am not saying that the FDIC is categorically prohibited from reviewing a request under § 303.244 while underlying litigation is pending.  But such a request would have to include the specific payment sought in the underlying litigation.  Here, plaintiffs' claims in the state court litigation are so broad that there is no specific proposed payment. Indeed, the FDIC itself concedes that there is not even a specific range.  FDIC's Supp. Br. at 5 n.2.

[6] As a practical matter, too much is left unknown for the FDIC to make a proper exercise of its discretion:  What claims, if any, will be successful?  What terms of the agreement will be enforceable?  Against whom?  How much are plaintiffs entitled to in damages? Who is ultimately responsible for paying those damages?  What are the terms of the settlement?  Without this information, the FDIC is left to speculate the cost to the insured institution and whether the payments would qualify as golden parachutes in the first place.

theories. *Id*. at 31-42. Defendants, by contrast, describe the state court litigation as asserting claims in the world as it occurred: "Regardless of how Bauer and Clark chose to describe their claims in the [s]tate [c]ourt [l]itigation, there can be no dispute that all of the amounts they seek stem from the termination of their employment at the troubled Bank and SCFC." FDIC's Opp'n at 11.

Of course, such a fundamental difference of perspective is predictable when the lawsuit is still in its infancy. The stay in the state court litigation prohibited the development of plaintiffs' theories of liability, further briefing and resolution of issues of state law, and potential settlement, all of which would have narrowed, and ultimately eliminated, the potential unknowns. What is certain is that neither the FDIC, nor this Court, is in a position to speculate the amount and nature of certain payments in an ongoing lawsuit when the parties' description of the claims in that lawsuit are as diametrically opposed as they are here.[7] The subgroup of Banks—not surprisingly—was looking for a final determination that would shortcut that litigation and encourage a settlement in the case. The FDIC—at the expense of a fair reading of their regulations—appears to be willing to accommodate them.

---

[7] The FDIC argues that this case should proceed as a matter of "efficiency" because an "up-or-down decision as to whether the Final Determinations run afoul [of] 5 U.S.C. § 706(2) on the merits … would serve to efficiently resolve the core federal issues." FDIC. Supp. Br. at 6. Unfortunately for the parties and the FDIC, but not the law, convenience of the litigants does not determine whether the FDIC exceeded its regulatory authority.

## B. The FDIC Acted Contrary to Law.

Having established the proper requirements of § 303.244, the sole remaining question is whether the FDIC made its "final determination" based on applications that satisfy § 303.244. It did not.

As previously noted, Bank Defendants' submission to the FDIC failed to provide the "cost of the proposed payment and its impact on the institution's capital and earnings."[8] (AR 173-81). Indeed, Bank Defendants' submission provided the FDIC with information required by other parts of § 303.244(c), including background concerning plaintiffs' employment, their Agreements, and the state court litigation, and the relevant contracts and complaint. (AR 174-326). And Bank Defendants' then sought a determination from the FDIC, among others, as to whether "the change-in control benefits … that Messrs. Bauer and Clark seek in the [state court litigation], and the additional termination benefits … are golden parachutes." (*Id.*). But this hardly comes close to § 303.244(c)(4)'s requirement for the "cost of the proposed payment." Essentially, Bank Defendants were requesting an advisory opinion about golden parachute payments that were *merely alleged* in the state court litigation.[9]

---

[8] Bank Defendants' submission also fails to provide the "reasons why the consent to the payment should be granted." 12 C.F.R. § 303.244(c)(1). Of course, Bank Defendants would be arguing against their interests in the state court litigation if they argued in favor of the payments in front of the FDIC. But this too undermines the FDIC's authority to make a final determination pursuant to § 303.244 where, as was the case here, a party merely asks for an advisory opinion about an unknown payment from ongoing litigation.

[9] It makes no difference that Bank Defendants provided the FDIC with the underlying agreements and various amounts of *some* of the potential damages that plaintiffs seek in the state court litigation. (AR 174 ("In the Lawsuit, Messrs. Bauer and Clark now seek to recover change-in-control payments under their Employment Agreements and Salary

Indeed, the FDIC concedes in a footnote that "***Bauer and Clark's damages are unfixed***" and that "Bauer and Clark seek '***at least*** $4,869,087 and $2,588,444' in the North Carolina proceeding." FDIC's Supp. Br. at 5 n.2 (emphasis added). As such, the FDIC readily admits the potential payment is not only hypothetical, *it is unknown*.[10] Consequently, Bank Defendants did not satisfy the requirements of § 303.244 by providing the FDIC with information about some of the potential damages.

Plaintiffs' submission to the FDIC similarly fails to provide any actual, proposed payment. Plaintiffs' submission provides arguments about why the relief in the state court litigation falls outside the purview of the golden parachute restrictions. (AR 882-85). But plaintiffs' submission offers no specific proposed relief sought in the state court litigation that could satisfy the requirements of § 303.244(c)(4).

Without the information required in § 303.244(c)(4), the FDIC based its final determination on its interpretation of the potential damages from the ongoing state court

---

Continuation Agreements. Mr. Bauer seeks $4,869,087; Mr. Clark seeks $2,588,444."); *id.* ("In addition, both Messrs. Bauer and Clark seek treble damages and attorneys' fees."). The potential payments provided in Bank Defendants' application do *not* include all the potential damages in the state court litigation. Pls.' Mot. at 28-29, 31-34 (arguing that the state court litigation entitled plaintiffs to salary and benefits and, in the alternative to change-in-control benefits, severance payments); *see also* State Court Litigation Am. Compl. ¶¶ 89-133. Bank Defendants also included various potential payouts to plaintiffs as listed in Southern Community's 2011 Proxy Statement. (AR 175). But none of these potential scenarios establish an actual, proposed payment. And plaintiffs' theories in the state court litigation are distinct from the scenarios in the Proxy Statement.

[10] Relatedly, even if the FDIC knew each of the possible payments, the FDIC was in no position to know which of the theories of liability, if any, would ultimately entitle plaintiffs to recover in the state court litigation or who would ultimately be liable. The breadth of potential outcomes in the state court litigation renders the fact that the FDIC knew (or could calculate) some of the payments nearly useless for purposes of exercising its discretion under the regulation.

litigation, which it admits was unknown. This approach falls outside the requirements of § 303.244(c). Consequently, the FDIC's final determination was contrary to law and "without observance of procedure required by law," *see* 5 U.S.C. §§ 706(2)(A), (2)(D), and the FDIC's final determination is hereby vacated.[11]

## CONCLUSION

For all of the foregoing reasons, plaintiffs' motion for summary judgment [Dkt. # 23] is **GRANTED IN PART** to the extent that the FDIC's final determination is vacated **AND DENIED IN PART AS MOOT** to the extent that I do not reach the merits of the FDIC's final determination and, therefore, do not opine on plaintiffs' request for injunctive and declaratory relief. Further, defendants' motions for summary judgment [Dkt. ## 20, 22] are **DENIED**. An order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[11] Because I vacate the FDIC's final determination without reaching the merits of the Final Determination or plaintiffs' request for declaratory and injunctive relief, plaintiffs' claims for declaratory and injunctive relief are denied as moot.