**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| F. SCOTT BAUER, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civil Case No. 18-3047 (RJL) |
| | ) |
| FEDERAL DEPOSIT INSURANCE | ) |
| CORPORATION, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**MEMORANDUM OPINION**
September *19*, 2023 [Dkt. ##50, 51, 53, 55]

In its 2017 determination, the Federal Deposit Insurance Corporation ("FDIC") rejected an effort by two former executives to recover money damages in a state-court action against a bank and its successors for alleged breaches of contract, tortious interference, and parallel state-law violations. The FDIC determined that the damages those executives sought, as well as any prospective settlements, qualified as "golden parachute payments" prohibited by federal statute—a decision that effectively smothered the executives' pursuit of their claims in state court by ensuring they would receive nothing even if they established the banks' liability. Now, before this Court, those executives have appealed the FDIC's determination as arbitrary and capricious under the Administrative Procedure Act ("APA"). In their motion for summary judgment, they argue that none of the payments that might comprise a future damages or settlement award in state court constitutes a golden parachute under the statutory or regulatory definition of that term. The

FDIC, as well as the banks on the hook for such an award, have opposed in cross-motions for summary judgment, insisting the FDIC was reasonable in forbidding the executives from collecting—whether through a settlement or judgment—the kinds of payments at issue.

For the reasons that follow, I will **GRANT IN PART** and **DENY IN PART** the parties' cross-motions. The FDIC reasonably determined that three of the four disputed payments—namely, the change-in-control benefits, severance payments, and contractual attorneys' fees—were prohibited golden parachutes and could not form any part of a prospective settlement or damages award in state court. As for the last group of payments—ordinary salary and benefits—the agency erred in concluding that an award in the state-court litigation based on those payments would be prohibited by the golden parachute rules. Accordingly, I will **VACATE** the FDIC's determination with respect to the salary and benefits payments.

## BACKGROUND

### I.    Legal Framework

The Federal Deposit Insurance Act ("FDI Act") gives the FDIC authority to regulate the financial practices of FDIC-insured banking institutions, as well as "institution-affiliated part[ies]" ("IAPs"), which include their directors, officers, employees, and controlling shareholders. 12 U.S.C. § 1813(c)(2), (u)(1). Among the practices the FDIC closely monitors is the disbursement of so-called "golden parachute payments" to an IAP. These typically consist of "windfall" payments contractually promised to an institution's high-ranking employees "if they are fired, the company becomes bankrupt, or the company

is acquired." *Wollschlager v. Fed. Deposit Ins. Corp.*, 992 F.3d 574, 578 (6th Cir. 2021).

While such arrangements are not categorically problematic, the FDI Act authorizes the

FDIC to restrict the circumstances under which an institution that has fallen into financial

disrepair can honor a golden parachute payment. 12 U.S.C. § 1828(k)(1). After all,

"making good on those promised payments may put more financial stress on an already

struggling institution or unjustly reward those who contributed to the [institution's]

financial woes." *Bauer v. Fed. Deposit Ins. Corp.*, 38 F.4th 1114, 1116 (D.C. Cir. 2022).

> The FDI Act specifically defines "golden parachute payment" as:
>
> any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or covered company for the benefit of any [IAP] pursuant to an obligation of such institution or covered company that—
>
>> (i) is contingent on the termination of such party's affiliation with the institution or covered company; and
>>
>> (ii) is received on or after the date on which—
>>
>>> …
>>>
>>> (III) the institution's appropriate Federal banking agency determines that the insured depository institution is in a troubled condition.

12 U.S.C. § 1828(k)(4)(A). The FDIC's implementing regulations largely track this

statutory definition, 12 C.F.R. § 359.1(f), while also clarifying that, "to qualify as a golden

parachute, the payment must be made to a party whose affiliation with the institution is

terminated at a time when the institution is in a troubled condition," *Bauer*, 38 F.4th at

1117 (citing 12 C.F.R. § 359.1(f)(1)(iii)). On this last point, the FDIC has further explained

that "[i]f [a] payment is prohibited" at the time the IAP's affiliation is terminated, "it is

prohibited forever," regardless of whether the institution later recovers or finds a healthy

buyer.  61 Fed. Reg. 5926-02, 5928 (Feb. 15, 1996).

Thus, consistent with the FDI Act's mandate and its own regulatory purpose in preventing the wrongful disposition of institution assets, the FDIC generally prohibits golden parachute payments "except as provided" by regulation.  12 C.F.R. § 359.2.  In all events, an institution wishing to make a golden parachute payment to an IAP must seek the FDIC's consent by written application.  *Id.* §§ 303.244(b)–(c), 359.4(a).  Once it reviews an application, the FDIC issues an administrative decision either granting or denying the institution's request to pay a golden parachute.

## II.    Factual and Procedural Background

### A.    The Employment Agreements, Southern Community's Financial Woes, Merger With Capital Bank, and Plaintiffs' Termination

Plaintiffs F. Scott Bauer and Jeffrey T. Clark ("plaintiffs" or "Bauer and Clark") were senior executives at Southern Community Bank & Trust and the bank's holding company, Southern Community Financial Corporation (together, "Southern Community").[1]  In 2006 and 2007, Bauer and Clark entered into a series of employment agreements with Southern Community setting out their rights and obligations as bank executives.  AR 219–326.  Four components of those agreements are relevant here.

First, the severance payments:  Under Sections 2.2, 3.1(b), and 4.4, Southern

---

[1] This opinion adopts the parties' preferred short terms for the various bank entity defendants.  *See, e.g.*, Compl. [Dkt. #1] ¶¶ 5, 6(c), 7.  When referring to defendants Southern Community Bank & Trust and Southern Community Financial Corporation, the collective term "Southern Community" is used.  When referring to defendants Capital Bank Financial Corporation, Capital Bank Corporation, Capital Bank, N.A., Winston 23 Corporation, and Southern Community Financial, LLC, the collective term "Capital Bank" is used.  The remaining three defendants in this case—the FDIC, First Horizon National Corporation ("First Horizon"), and First Tennessee Bank National Association ("First Tennessee")—are referred to individually.

Community was authorized to terminate Bauer and Clark without cause upon 60 days' notice, but in that event, Bauer and Clark would be entitled to their base salaries for the unexpired term of the agreements, as well as monthly retirement benefits beginning at age 62. AR 220, 224, 228, 253, 274, 278, 280–81, 306. Second, change-in-control benefits: Under Sections 5.1 through 5.4, Bauer and Clark would each receive a lump-sum cash payment equal to three times his annual compensation if Southern Community underwent a change in control, as through a merger. AR 229–31, 281–83. Notably, Bauer and Clark could collect either the severance payments or change-in-control benefits, but not both, under the agreements' express terms. AR 930, 982. Third, attorneys' fees: Section 8.9 of the agreements required Southern Community to pay up to $500,000 in any attorneys' fees incurred by Bauer and Clark if they had to retain counsel to enforce their legal entitlement to the change-in-control benefits. AR 239–40, 291–92. Finally, the assumption provisions: Under Section 8.1, Southern Community was obligated to "require any successor … to expressly assume and agree to perform this Employment Agreement in the same manner and to the same extent [that Southern Community] would be required to perform if no such succession had occurred." AR 237, 289.

Shortly after the employment agreements were signed, Southern Community began to experience financial difficulties. In 2008, the bank accepted almost $43 million in U.S. Treasury investment under the Troubled Asset Relief Program ("TARP"). AR 355, 487. In early 2010, the FDIC downgraded Southern Community's asset quality to a less than satisfactory rating following an in-person visit to the bank by FDIC examiners. AR 1–5. Later that year, after a second in-person visit, the FDIC issued a report detailing Southern

Community's deteriorating financial condition and deficient management practices, including those of Bauer and Clark. AR 6–75. By February 2011, Southern Community had agreed to a consent order with the FDIC that required the bank to take remedial actions to improve its situation. AR 697–722. As part of that order, Southern Community was deemed to be "in a troubled condition" for purposes of the FDI Act and its regulations. AR 79; *see* 12 U.S.C. § 1828(k)(4)(A)(ii); 12 C.F.R. §§ 225.71(d)(2), 303.101(c). The consent order also required Southern Community to obtain a management assessment report from an independent consultant, who ultimately concluded that Bauer's and Clark's deficient leadership had contributed to the bank's financial woes. AR 724–862, 1056.

In March 2012, after several years of uncured financial trouble, Southern Community sought to merge with Capital Bank Financial Corporation and its related affiliates (collectively, "Capital Bank"), a healthy institution. AR 383–462. The merger plan required Bauer and Clark to enter into amended employment agreements that would have limited their roles at the bank and substantially reduced the benefits to which they were entitled. AR 452. Bauer and Clark refused to sign the amended agreements, and in September 2012, Southern Community terminated the executives without cause under Section 3.1(b) of their original agreements. AR 176. The merger with Capital Bank closed on October 1, 2012.

**B.   The State-Court Action and FDIC's Administrative Decision**

In November 2014, Bauer and Clark sued Southern Community and Capital Bank in North Carolina state court, asserting breaches of contract, tortious interference, and unfair and deceptive trade practices under North Carolina law. *See Bauer v. Southern*

*Cmty. Fin. Corp.*, No. 14-CVS-7208 (N.C. Super. Ct. filed Nov. 26, 2014); AR 183–218. They alleged that Southern Community had breached its obligation to ensure that its successor, Capital Bank, "assume and agree to perform" the terms of their original employment agreements—theorizing that, had Southern Community honored the assumption provisions of Section 8.1, Bauer and Clark would have become employees of non-troubled Capital Bank and would have received the payments to which they were entitled, including their ordinary salaries and benefits, change-in-control payments, severance payments, and/or attorneys' fees. AR 208–212. Bauer and Clark also alleged that, "but for Capital Bank's tortious interference in requiring them to sign the amended employment agreements, they would have been retained as employees of the new merged entity and continued to receive compensation and benefits." *Bauer*, 38 F.4th at 1119; *see* AR 212–216. Based on these various contract, tort, and statutory theories of harm, Bauer and Clark sought judgment against the banks "in an amount to be determined at trial," as well as treble damages under North Carolina law and attorneys' fees. AR 216.

After their motion to dismiss was denied, Southern Community and Capital Bank filed a written application with the FDIC, seeking guidance as to whether the golden parachute restrictions would prevent Bauer and Clark from collecting the monetary relief they demanded in state court. AR 173–180. In response, Bauer and Clark submitted their own letter to the FDIC, insisting that "there is nothing for [the FDIC] to 'determine' under [12 C.F.R.] Part 359" because the payment of any settlement or judgment based on the breach of a purely non-financial obligation would not constitute a golden parachute. AR 885. The letter further explained that, had Capital Bank assumed Bauer and Clark's

original employment agreements, "nothing would have prevented Capital Bank from making any payments under" those agreements, because Capital Bank—unlike Southern Community—has never been a "troubled" institution.  AR 883–884.

In June 2017, the FDIC issued its final decision, concluding that "any payments to Bauer and Clark" arising from their state-court litigation "are golden parachute payments" prohibited by the FDI Act.  AR 1061, 1069.  Specifically, and as relevant here, the FDIC determined that: (1) all "change-in-control benefits and additional termination benefits are subject to … the Golden Parachute Rules"; (2) Capital Bank, "as [the] healthy successor[] to the troubled entities from whom the payment obligation arises, … cannot make these payments on [Southern Community]'s behalf"; (3) because plaintiffs' "tort and statutory claims arise from the same agreement," those claims, too, "are subject to the limitations of the Golden Parachute Rules"; and lastly, (4) "[a]ny payment of attorney's fees," or "any settlement amount related to the State Court Action," would also be a golden parachute.  AR 1061, 1069.  In explaining these determinations, the FDIC reasoned, inter alia, that it "has consistently maintained that golden parachute payments by a healthy acquirer are subject to the Golden Parachute Rules to prevent IAPs from circumventing the golden parachute regulation as a result of the timing or the structure of a purchase by a healthy acquirer."  AR 1058, 1066.  Moreover, the FDIC declared, if a healthy successor's payment obligations exist merely because it "contractual[ly] assum[ed]" the obligations of a troubled institution, the successor "can no more make these payments without prior regulatory approval than could the troubled entities."  AR 1058, 1066.

Accordingly, the FDIC denied Southern Community and Capital Bank's golden

parachute application "in its entirety." AR 1054, 1062. The state-court litigation was stayed to allow Bauer and Clark to challenge the FDIC's determination in federal court.

### C.    The Present Litigation

In December 2018, Bauer and Clark filed the present action against the FDIC, Southern Community, Capital Bank, and Capital Bank's two successors—First Horizon and First Tennessee, *see supra* note 1—challenging the FDIC's golden parachute determination under the APA. After the parties cross-moved for summary judgment, the Court requested supplemental briefing on "[w]hether the FDIC acted inconsistently with 12 C.F.R. § 303.244 by issuing a decision about hypothetical damages [or settlement] payments." Minute Order (June 10, 2020). Consistent with that Minute Order, and based on my own review of the FDI Act and implementing regulations, I vacated the FDIC's golden parachute determination, concluding that the FDIC had exceeded its authority in issuing that determination without knowing the specific amount of the payments sought in the underlying state-court action. *Bauer v. FDIC*, 486 F. Supp. 3d 93, 100, 101 n.5. (D.D.C. 2020), *rev'd*, 38 F.4th 1114 (D.C. Cir. 2022). Having vacated the FDIC's determination on these grounds, I left unaddressed the merits of Bauer and Clark's APA claims.

In July 2022, our Circuit Court reversed my ruling on this score. *Bauer*, 38 F.4th at 1116. It held, to the contrary, that the FDIC had acted within its authority to render a decision based on hypothetical payments, and it directed this Court on remand to address Bauer and Clark's APA claims in the first instance. *Id.* at 1126. After the mandate issued, the Court and parties agreed to a schedule for renewed summary judgment briefing, which

concluded in February 2023.  *See generally* Pls.' Mot. Summ. J. [Dkt. #50] ("Pls.' Mot.");

FDIC's Cross-Mot. Summ. J. & Opp'n to Pls.' Mot. [Dkt. #51] ("FDIC's Mot. & Opp'n");

Bank Defs.' Cross-Mot. Summ. J. & Opp'n to Pls.' Mot. [Dkt. ##53, 55] ("Bank Defs.'

Mot. & Opp'n"); Pls.' Opp'n to Defs.' Cross-Mot. Summ. J. & Reply in Supp. Mot. Summ.

J. [Dkt. #57]; FDIC's Reply in Supp. Cross-Mot. Summ. J. [Dkt. #59]; Bank Defs.' Reply

in Supp. Cross-Mot. Summ. J. [Dkt. #60] ("Bank Defs.' Reply").  The parties' cross-

motions are now ripe for review.

## LEGAL STANDARD

While, normally, Federal Rule of Civil Procedure 56 governs the Court's review of

a motion for summary judgment, "the standard set forth in Rule 56[] does not apply" in

cases challenging agency action "because of the limited role of a court in reviewing the

administrative record."  *Se. Conf. v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

Instead, "[s]ummary judgment is … the mechanism for deciding whether as a matter of

law the agency action is supported by the administrative record and is otherwise consistent

with the APA standard of review."  *Id.*  In turn, the APA allows a court to overturn agency

action only if it is arbitrary, capricious, or otherwise contrary to law.  5 U.S.C. § 706(2).

Under this "deferential" standard, "[a] court simply ensures that the agency has acted

within a zone of reasonableness and, in particular, has reasonably considered the relevant

issues and reasonably explained the decision."  *Fed. Commc'ns Comm'n v. Prometheus

Radio Project*, 141 S. Ct. 1150, 1158 (2021).  While a court may not "substitute its own

judgment for that of the agency," *Nat'l Ass'n of Regul. Util. Comm'rs v. Fed. Energy Regul.

Comm'n*, 964 F.3d 1177, 1189 (D.C. Cir. 2020), it must nevertheless "uphold a decision of

less than ideal clarity if the agency's path can reasonably be discerned," *Xcel Energy Servs.*

*Inc. v. Fed. Energy Regul. Comm'n*, 41 F.4th 548, 557 (D.C. Cir. 2022) (quoting *Motor*

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## DISCUSSION

"The FDIC's golden parachute decision came in two distinct steps." *Bauer*, 38 F.4th

at 1122.  On remand, Bauer and Clark challenge only the first step: "whether the proposed

payments [sought in state court] constitute golden parachutes within the statutory and

regulatory definitions."  *Id.*  For purposes of those definitions, all parties agree that Bauer

and Clark are IAPs, 12 U.S.C. § 1828(u)(1), and that Southern Community was "in a

troubled condition" at the time of the merger, *id.* § 1828(k)(4); 12 C.F.R. § 359.1(f).

**I.    The FDIC may restrict a healthy successor's payment of a judgment or settlement if it consists of prohibited golden parachute payments.**

As an initial matter, the parties spend much of their briefs debating whether Capital

Bank's satisfaction of a potential judgment or settlement falls within the FDIC's power to

regulate at all.  Bauer and Clark insist the answer is "no," and that the FDIC's determination

misunderstands their state-court claims:  They are not seeking the recovery of specific

payments, which the FDIC may restrict, but are instead seeking damages for Southern

Community's breach of a "non-financial obligation" (i.e., the assumption provisions),

Capital Bank's tortious conduct, and statutory violations.  Defendants counter that

"[r]egardless of how Bauer and Clark chose to describe their claims in the State Court

Litigation," what they seek, at bottom, are the compensation and benefits allegedly owed

to them under their original employment agreements.  FDIC's Mot. & Opp'n 12; *see* Bank

Defs.' Reply 2–4.  It does not matter, defendants continue, that a healthy successor—as opposed to "troubled" Southern Community—would be the payor, or that Bauer and Clark's damages claims are premised on non-monetary theories of harm.  The FDIC has the authority to regulate "*any* payment (or any agreement to make any payment) in the nature of compensation," 12 U.S.C. § 1828(k)(4) (emphasis added), with "payment" itself broadly defined as "any direct or indirect transfer of any funds or any asset," *id.* § 1828(k)(5)(C).

Upon reflection, it seems to me the defendants have the better argument here.  To suggest, as Bauer and Clark do, that their state lawsuit is not really about "payments" defies reality—not only in the sense that a request for money damages plainly contemplates the "transfer of any funds or any asset," *id.*, but also because an award of damages to Bauer and Clark would be measured by the specific payments described in their contracts with Southern Community.  This is true, of course, regardless of whether those damages stem from a contract claim, tort claim, or some other cause of action.  *See Harrison v. Ocean Bank*, 614 Fed. App. 429, 432 (11th Cir. 2015) (affirming FDIC's determination that the pre-suit settlement of tort and statutory claims—including "defamation; intentional infliction of emotional distress; whistleblower retaliation"—constituted a golden parachute); *Von Rohr v. Reliance Bank*, 2015 WL 3440343, at *4 (E.D. Mo. May 28, 2015) (affirming "FDIC's determination that the contractual damages plaintiff seeks constitute a golden parachute"), *aff'd*, *Rohr v. Reliance Bank*, 826 F.3d 1046 (8th Cir. 2016).  It is also true regardless of whether Southern Community, Capital Bank, or another healthy successor would be the one writing the check.  *Cf.* 12 C.F.R. § 359.0(b) (explaining that

the golden parachute limitations apply not only to troubled institutions but to "healthy holding companies which seek to enter into contracts to pay … IAPs of a troubled [institution]"). "[T]he golden parachute provisions focus on qualifying *payments*, not on qualifying *institutions*." *BBX Cap. v. Fed. Deposit Ins. Corp.*, 956 F.3d 1304, 1315 (11th Cir. 2020) (emphases added). To hold differently is to "allow otherwise prohibited golden parachute payments to be made through simple corporate restructuring[,] or by delaying the payments until … the institution is no longer 'troubled.'" *Id.* at 1316; *see also BBX Cap. v. Fed. Deposit Ins. Corp.*, 2018 WL 6531607, at *10 (S.D. Fla. Nov. 14, 2018).

None of this is to say the FDIC can *categorically* restrict the payment of a judgment or settlement in these circumstances. Each of the payments (or agreements to pay) that would underlie such an award must itself still qualify as a golden parachute under the FDI Act and regulations. *See Sterling Sav. Bank v. Stanley*, 2012 WL 3643679, at *2 (E.D. Wash. Aug. 23, 2012) (in analogous TARP context, agreeing the FDIC could, "in a vacuum," regulate "the payment of a discrimination-damages award," but disagreeing that the award in that case met the other requirements for being a golden parachute). The bottom line, rather, is that Bauer and Clark cannot seek indirectly what they are prohibited from seeking directly. If the golden parachute restrictions forbid an IAP from recovering a specific payment, they also forbid the IAP from seeking the same payment by another means—as, in this case, through a claim for damages, even one based on non-financial harms and paid by a healthy bank. *See* 61 Fed. Reg. at 5928 ("If this payment is prohibited under the [golden parachute provisions], it is prohibited forever."); *BBX*, 995 F.3d at 1316.

II.    **Most, but not all, of the disputed payments are prohibited golden parachutes.**

Concluding that the FDIC was reasonable in finding Capital Bank's payment of a prospective award in the state-court litigation subject to the golden parachute rules does not, however, end this case. The component payments by which that award would be measured must themselves be prohibited by the golden parachute rules before the FDIC can forbid Bauer and Clark from recovering it. Here, Bauer and Clark identify four distinct payments from their employment agreements with Southern Community that would comprise a damages award in state court: (1) change-in-control benefits, (2) severance payments, (3) contractual attorneys' fees, and (4) ordinary salary and benefits.

A.    **Change-in-Control Benefits**

First up are the change-in-control benefits. Had Capital Bank agreed to assume the payment obligations of the original employment agreements, the change-in-control benefits would have been payable to Bauer and Clark upon the merger of Southern Community and Capital Bank. In its 2017 determination, the FDIC concluded that these benefits were quintessential golden parachutes because they "arose as a result of [Bauer and Clark's] termination" from Southern Community and would have been made after Southern Community was deemed to be "troubled." AR 1058. In their briefs, defendants add that the word "termination" is used broadly in the FDI Act and regulations, covering not just an executive's termination of employment, but the termination of his "affiliation" with an institution.[2] Resisting these conclusions, Bauer and Clark raise two arguments for

---

[2] Defendants separately argue in their briefs that, because the assumption provisions of Section 8.1 make successors responsible for performing the employment contracts only "to the same extent" as

14

why the change-in-control benefits cannot be golden parachutes: first, because they would have been paid by non-troubled Capital Bank and, second, because Bauer and Clark would not have been "terminated" had the banks honored the original employment agreements.

Defendants again have the better of this dispute. For one thing, as already explained, plaintiffs' first argument—that the golden parachute rules "appl[y] exclusively to payments by troubled institutions," Pls.' Mot. 36–37—runs headlong into the FDIC's "focus on payments and agreements to make payments," rather than on institutions, *BBX*, 956 F.3d at 1316. That focus is "reasonable and makes sense," *id.*, because it "advances a policy goal of preventing loopholes that would allow bankers to engineer transactions [e.g., mergers] to avoid the golden parachute restrictions," *BBX*, 2018 WL 6531607, at *10; *cf.* 12 C.F.R. § 359.0(b); *Hill v. Com. Bancorp, Inc.*, 2012 WL 694639, at *5 (D.N.J. Mar. 1, 2012) ("An interpretation according to which an entity's 'troubled' status is destroyed by its acquisition would eviscerate the [FDI Act]'s restrictions by providing a safe harbor to officers and directors seeking to activate their golden parachutes through acquisition by another institution."). Indeed, the more relevant question in golden parachute cases is not "who," but "when": If a payment or agreement to make a payment "is prohibited … at the time of an IAP's termination due to the troubled condition of the [institution]," "it is

---

Southern Community, AR 938, and because—at the time of the merger—troubled Southern Community was barred from performing the payment obligations of those contracts so, too, is successor Capital Bank barred from doing the same. This state-law issue of contract construction played no part in the FDIC's determination, however, which was grounded in the interpretation and application of its own regulations— not the interpretation of Bauer and Clark's employment contracts. Because "we may uphold agency orders based only on reasoning that is fairly stated by the agency," *Williams Gas Processing-Gulf Coast Co. v. FERC*, 373 F.3d 1335, 1345 (D.C. Cir. 2004), I will not address defendants' after-the-fact justifications here.

prohibited forever," regardless of the eventual payor. 61 Fed. Reg. at 5928; *see* 12 C.F.R.
§ 359.1(f)(1)(iii)(A) (resting the golden parachute definition on the timing of the
termination, not when the check is written).

Bauer and Clark's second argument fares no better. In their telling, had Capital
Bank assumed their employment agreements with Southern Community, Bauer and Clark
"would have seamlessly become employees of the non-troubled successor by virtue of the
merger, i.e., there would have been no termination." Pls.' Mot. 39. Assuming the validity
of plaintiffs' "but for" analysis, their focus on termination of *employment* is misplaced;
termination of *affiliation*, as defendants point out, is equally covered by the plain text of
the FDI Act and regulations. *See* 12 U.S.C. § 1828(k)(4)(A); 21 C.F.R. § 359.1(f)(1)(i).
Thus, even in their "but for" world—a world in which Bauer and Clark were not fired by
Southern Community—their affiliation with that institution would have ended as soon as
the merger closed and Southern Community ceased to exist. *See Harrison*, 614 Fed. App.
at 437 ("[T]he regulation adopts a broad interpretation of the statute's use of the word
'termination[.]'").

Pulling these definitional elements together, the FDIC was reasonable in concluding
that the change-in-control benefits were prohibited golden parachutes. Under Sections 5.1
through 5.4 of the employment agreements, those benefits were expressly "contingent on"
the close of the merger (i.e., the change in control from Southern Community to Capital
Bank), which would have terminated Bauer and Clark's affiliation with Southern
Community. And, at the time of the would-be termination, Southern Community was "in
a troubled condition," making any effort to pay the benefits prohibited absent the FDIC's

written permission. On their own terms, then, the change-in-control benefits contemplated by Bauer and Clark's original employment agreements could not have been paid at the time of the merger and are now "prohibited forever." 61 Fed. Reg. at 5928.

The FDIC's reasoning offers a second path, too, for upholding its decision here. *See Xcel Energy Servs.*, 41 F.4th at 557. Recall that Bauer and Clark's various theories of harm in the state-court litigation are all premised on the banks' failure to comply with the assumption provisions of Section 8.1, which provide that, in the event of a "succession," Southern Community "shall require any successor … to expressly assume and agree to perform this Employment Agreement in the same manner and to the same extent [Southern Community] would be required to perform if no such succession had occurred." AR 990. This would involve agreeing to perform all payment obligations under the employment contracts, including the change-in-control benefits. But this is exactly the kind of "*agreement* to make any payment" that the golden parachute rules are designed to forestall. 12 U.S.C. § 1828(k)(5)(C); 12 C.F.R. § 369.1(k)(1) (emphasis added). If, in Bauer and Clark's "but for" world, Capital Bank had agreed to assume the change-in-control payment obligations of Southern Community, that agreement would have been "contingent on" Capital Bank's succession (i.e., plaintiffs' termination of affiliation with Southern Community), as would the obligations themselves. And, at the time Capital Bank would have entered the agreement to pay Southern Community's financial obligations, Southern Community would have been a "troubled" institution subject to the golden parachute rules. *Cf.* 12 C.F.R. § 359.0(b) (applying golden parachute limitations to "healthy holding companies which seek to enter into contracts to pay or to make golden parachute payments

to IAPs of a troubled [institution]"); *BBX*, 956 F.3d at 1310, 1315–1317. Simply put, the golden parachute limitations would have never allowed Capital Bank to agree to pay Southern Community's change-in-control obligations in the first place. Any theory of damages premised on that "but for" scenario collapses on this reality.[3]

### B.    Severance Payments

Next up are the severance payments. On this front, plaintiffs theorize that had Capital Bank agreed to assume the original employment agreements, *and* had Capital Bank been the one to fire Bauer and Clark, they would have received the severance payments from post-merger Capital Bank, which was not covered by the golden parachute rules. Specifically, while admitting that the "severance payments (and Capital's agreement to make them) … would be by their nature contingent on termination," Bauer and Clark insist those payments do not meet the second element of the golden parachute definition: "[T]hey *would not be made* on or after a determination that Capital [Bank] was troubled." Pls.' Mot. 33.

As before, plaintiffs' focus on the timing of the *payments*, rather than the timing of the *termination*, misses the point. *See* 12 C.F.R. § 359.1(f)(1)(iii)(A). That distinction is

---

[3] In the alternative, Bauer and Clark argue that, "if the Court agrees with the FDIC that the Change-in-Control Benefits could not have been paid by Capital immediately after the merger, then the Change-in-Control Benefits would have continued under the assumed agreements" and would have been payable upon the change in control from Capital Bank to First Horizon and First Tennessee in November 2017. Pls.' Mot. 39. Yet the FDIC did not address this new change-in-control scenario, since its determination came several months prior to the 2017 merger. Neither the prospect of that merger, nor any other change in Capital Bank's circumstances that might affect a golden parachute analysis, was presented to the FDIC when it made its decision. Because review of agency action under the APA "is limited to the administrative record before the agency at the time of its decision," *EarthReports, Inc. v. Fed. Energy Reg. Comm'n*, 828 F.3d 949, 137 (D.C. Cir. 2016), I will not invalidate the FDIC's decision as arbitrary and capricious based on facts or arguments it had no reason or duty to anticipate.

especially salient here, given that the problem in this case is just as much about the payments themselves as it is about Capital Bank's would-be *agreement* to make the payments, which—in Bauer and Clark's "but for" analysis—would have occurred upon termination of their affiliation with troubled Southern Community. Put another way, the same golden parachute analysis that would have precluded Capital Bank from agreeing to assume the change-in-control payments at the merger with Southern Community, *see supra* at 17–18, applies with equal force to the severance payments, since both payment obligations—which themselves are contingent on a termination event—would have arisen from the same prohibited agreement to perform the employment contracts of a troubled bank.

The Eleventh Circuit recognized as much in a case dealing with a similar agreement by an institution (Bancorp) and its healthy successor (BBX) to assume the severance payment obligations of a troubled institution (BankAtlantic) "upon closing" of their merger. *BBX*, 956 F.3d at 1309–1310; *see also BBX*, 2018 WL 6531607, at *7. Before the FDIC, BBX had argued that the severance payments in that case were not golden parachutes because, "once BBX's obligation to make the Proposed Payments arose under the [Stock Purchase Agreement (SPA)]," BBX would have "exited the banking industry" and would no longer be covered by the golden parachute rules. *BBX*, 2018 WL 6531607, at *7. Rejecting that argument, the FDIC concluded that, regardless of whether BBX was covered by the rules at the time the severance payments came due, the payments "remain[ed] subject to regulation given that they were *agreed to*" at a time when Bancorp was a covered company and BankAtlantic was still troubled. *Id.* (emphasis added). Both

the district court and Eleventh Circuit later upheld the FDIC's reasoning, holding that, because "[t]he SPA was an agreement that obligated BBX to make certain qualifying payments" to BankAtlantic's IAPs, and because "[BankAtlantic] was still a 'troubled' institution at the time the SPA was executed," the FDIC did not act unreasonably in applying the golden parachute limitations to the situation at hand. *BBX*, 956 F.3d at 1316; *see also BBX*, 2018 WL 6531607, at *8. In a coda to its analysis, the Eleventh Circuit remarked that, if the bank wishing to make an otherwise prohibited payment "was in fact no longer 'troubled,' then it could have executed new severance agreements that would not have been subject to the golden parachute restrictions." *BBX*, 956 F.3d at 1316.

So, too, here. In Bauer and Clark's "but for" world, the agreement to perform Southern Community's employment contracts under Section 8.1 "was an agreement that obligated [Capital Bank] to make certain qualifying payments," including severance payments, to Southern Community's IAPs. *Id*; *accord* AR 1058. And, at the time the agreement would have been entered (i.e., at the merger), Southern Community "was still a 'troubled' institution." *BBX*, 956 F.3d at 1316. Under *BBX* and the plain language of the regulations alike, these facts put the would-be agreement well "within the golden parachute framework's purview." *Id.*; *see Larison v. Ameris Bank*, 2022 WL 4548216, at *8 (M.D. Fla. July 20, 2022) (rejecting argument that a benefit payment "did not constitute a golden parachute because the bank's troubled designation was lifted," since the earlier agreement to make that payment "was executed … while the bank was still troubled"). Unless and until Capital Bank chose to execute new payment agreements, the FDIC was reasonable in recognizing, and closing, a potential loophole by which a troubled bank can skirt the golden

parachute restrictions by contractually requiring its successor to agree to perform payment obligations the bank itself could not. *Cf. Rohr*, 826 F.3d at 1051 (rejecting interpretation of regulations that "would create a giant loophole" by enabling "[b]anks and executives [to] structure their agreements to allow for … payments that would function as golden parachutes but avoid the magic words triggering the FDIC's regulations").

### C.    Contractual Attorneys' Fees

The FDIC was likewise reasonable in deciding that the third payment at issue— attorneys' fees under Section 8.9 of the agreements—was a prohibited golden parachute. Finding that "payment of the fees would constitute a benefit to Bauer and Clark," the FDIC ultimately concluded it could not treat attorneys' fees "as separate from the change-in-control payments," since those fees "arise directly from obligations … to pay change-in-control payments." AR 1060. On this last point, the FDIC further explained that Bauer and Clark would not have incurred attorneys' fees at all had there been no change in control, making them dependent not only on the change-in-control obligations, but on the change in control itself. Challenging this outcome, Bauer and Clark raise two arguments for why the payment of attorneys' fees is not restricted by the golden parachute rules. Both are easily rejected.

First, Bauer and Clark contend that legal fees are not "in the nature of compensation" within the meaning of the FDI Act and regulations, 12 C.F.R. § 359.1(f)(1), since any fees would be payable to Bauer and Clark's attorneys, not Bauer and Clark themselves. This cramped reading of the golden parachute restrictions, however, is unsupported by the plain text of the regulations, the caselaw, and common sense alike. *See*

*Harrison*, 614 Fed. App. at 438 (explaining that the term "in the nature of compensation" "should be construed broadly," and finding the payment of attorneys' fees to be "plainly compensatory in nature"); *Harrison v. Ocean Bank*, 2011 WL 2607086, at \*5 (S.D. Fla. June 30, 2011) (similar); *see also Knyal v. Office of Comptroller of Currency*, 2003 WL 26465939, at \*15 (N.D. Cal. Nov. 25, 2003) (in similar vein, finding the payment of insurance policy premiums on an IAP's behalf to be "in the nature of compensation"). Any payment of attorneys' fees would relieve Bauer and Clark from having to pay the fees themselves. That scenario is plainly encompassed by the rules' prohibition on the "direct *or indirect* transfer" of funds, assets, or other compensation, 12 U.S.C. § 1828(k)(5)(C) (emphasis added), "for the benefit of" an IAP, 12 C.F.R. § 359.1(f)(1).

Second, Bauer and Clark maintain that the payment of legal fees would not, in fact, be "contingent on" their "termination" because those fees would be triggered only if Bauer and Clark sought to enforce their asserted right to the change-in-control benefits in court. Again, however, Bauer and Clark take too narrow a view of the golden parachute rules. As explained above, *see supra* at 16, "termination" means not just the termination of an IAP's employment, but the termination of his affiliation with an institution—which, in this case, would have occurred upon the change in control from Southern Community to Capital Bank. Meanwhile, as a practical matter, the legal fees provision would kick in only after Southern Community in fact experienced a change in control, since Bauer and Clark would have no cognizable right to change-in-control benefits otherwise, and no need to enforce that right in court. Thus, putting two and two together, the attorneys' fees under Section 8.9 are effectively contingent on Bauer and Clark's termination of affiliation with Southern

Community via the change in control. Any argument to the contrary is little more than a repackaged disagreement with the FDIC's reasonable conclusion that the underlying change-in-control benefits are themselves prohibited golden parachutes.

### D.    Ordinary Salary and Benefits

Lastly, Bauer and Clark seek as damages "at least 60 days" of salary and benefits under their original employment contracts. Pls.' Mot. 28. In plaintiffs' narrative, "[h]ad the Agreements been assumed and performed, Bauer and Clark would have been entitled to receive their ordinary salary and benefits" from non-troubled Capital Bank, pursuant to Capital Bank's own obligation to compensate them for work performed. *Id.* These kinds of payments, plaintiffs claim, are not golden parachutes because they meet "*none* of the definitional elements of 12 C.F.R. § 359.1(f)": They are neither "contingent on" Bauer and Clark's "termination," nor would they have been paid after a "troubled" designation. *Id.* at 31–32. For their part, defendants respond that Bauer and Clark "never presented" this theory to the agency and are therefore barred from raising it here. FDIC's Mot. & Opp'n 25–26. The bank defendants additionally contend that salary and benefits should "not [be] treated differently from change-in-control payments or severance payments; regardless of the type of payment, the golden parachute statute and regulations apply to *agreements* ... [that] shift[] payment obligations from a troubled institution to a non-troubled entity." Bank Defs.' Mot. & Opp'n 41 (emphasis added).

For starters, defendants are only half correct that Bauer and Clark did not present this argument to the FDIC. While, to be sure, plaintiffs' letters to the agency did not mention "salary and benefits" specifically, they made abundantly clear that their theories

of harm in the state-court action were premised on the banks' failure to comply with the assumption provisions of Section 8.1, which "were supposed to guarantee [Bauer and Clark's] employment with any successor." AR 883. From this premise, the FDIC could have anticipated that Bauer and Clark were seeking to recover *all* payments provided by their original employment agreements, including salary and benefits. In any event, it is not clear the FDIC did *not* anticipate or address this argument: After acknowledging that plaintiffs' claims stemmed from the banks' "failure to require Capital to agree to assume and perform the Agreements," AR 812, the FDIC's determination broadly concluded "that *any* payments to Bauer and Clark are golden parachute payments," AR 816 (emphasis added). On this ground alone, I am not persuaded that plaintiffs' arguments on this score were either waived by Bauer and Clark or wholly ignored by the FDIC.

Finding no waiver here, Bauer and Clark at last have a winning argument. True, as the bank defendants point out, Capital Bank's would-be agreement with Southern Community to perform Bauer and Clark employment contracts would have included an agreement to pay their ordinary salary and benefits, in addition to change-in-control benefits, severance payments, and attorneys' fees. And that *agreement* to pay, as explained above, would have met all elements of the golden parachute definition, since it would have been contingent on Capital Bank's merger (and consequent termination of plaintiffs' affiliation) with Southern Community, which was troubled at that time. But critically, the change-in-control benefits, severance payments, and attorneys' fees were also *themselves* "contingent on, or by [their] terms payable on or after," a termination event; ordinary salary and benefits are not. Indeed, when dealing with a situation like this one involving the

attempt to transfer one bank's obligations to a successor entity, it makes sense to require both: The agreement to pay, and the payment itself, must be contingent on some termination event. Otherwise, payments that clearly do not offend the FDI Act and its purposes, including payments for services actually rendered, could be deemed golden parachutes simply by virtue of their inclusion in a prohibited agreement.

The FDIC does not disagree with this reasoning, at least not in the abstract. Indeed, before this Court and elsewhere, it has conceded that "[e]arned compensation, for actual, bona fide employment at a non-troubled bank, is not subject to the golden parachute restrictions," because it is not contingent on termination. FDIC's Mot. & Opp'n 25 n.7; *see* Fed. Deposit Ins. Corp., *Guidance on Golden Parachute Applications* at 1 n.2, https://perma.cc/QAQ2-6N6P ("The restrictions do not apply to the payment of salaries or bonuses."); *see also Rohr*, 826 F.3d at 1050. Rather, the agency's concern in this case— aside from plaintiffs' purported waiver—is that Bauer and Clark never worked as Capital Bank employees, since they were fired before the merger; thus, there can be no compensation owed for work that Bauer and Clark never performed. But for purposes of plaintiffs' claims in state court, what matters is not the "real" world but Bauer and Clark's "but for" world—a world in which they allege they would have been retained as employees of Capital Bank and would have worked there until Capital Bank fired them. If Bauer and Clark can prove in state court that their "but for" world would have been the "real" world absent the banks' breaches of contract, torts, and state-law violations, the golden parachute rules should not foreclose their recovery of damages for the salary and benefits they would have earned while Capital Bank continued to employ them.

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for summary judgment [Dkt. #50], the FDIC's cross-motion for summary judgment [Dkt. #51], and the bank defendants' cross-motion for summary judgment [Dkt. ##53, 55] are **GRANTED IN PART** and **DENIED IN PART**, and the FDIC's determination with respect to the salary and benefits payments is **VACATED**. An order consistent with this Memorandum Opinion will issue on this date.

RICHARD J. LEON
United States District Judge